**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRIENDS OF ANIMALS<br>777 Post Road, Suite 205<br>Darien, CT 06820, and<br><br>ZIMBABWE CONSERVATION<br>TASK FORCE,<br>3 Fairbairn Drive, Mount Pleasant<br>Harare, Zimbabwe,<br><br>Plaintiffs,<br>v.<br><br>Honorable JOHN KERRY,<br>in his official capacity as<br>Secretary of State,<br>U.S. Department of State<br>2201 C Street NW<br>Washington, DC 20520, and<br><br>Honorable SALLY JEWELL,<br>in her official capacity<br>as Secretary of the Interior,<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington D.C., 20240,<br><br>Defendants. | Civ. No. 1:15-cv-831 |

---

**COMPLAINT**

---

1. On January 16, 2015, Friends of Animals and Zimbabwe Conservation Task Force (collectively, "Petitioners") submitted to the Secretary of State and the Secretary of the Interior an Emergency Rulemaking Petition for the Issuance of a Policy Statement by the United States Condemning the Export of African Baby Elephants (*Loxodonta africana)* by Zimbabwe (hereinafter, "Emergency Rulemaking Petition"). *See* Attachment 1.

2.      Through the Emergency Rulemaking Petition, Petitioners sought the emergency issuance of a policy statement by the U.S. State Department and/or Department of the Interior: (1) condemning Zimbabwe's plan to export a portion of the countries baby African elephant population to foreign countries as inconsistent with international elephant conservation objectives and goals; (2) calling upon the President of Zimbabwe to halt further implementation of the plan and instead establish an adequate elephant management plan consistent with best available science, international conservation values, and with all relevant international legal authorities and policies; and (3) calling upon China and the United Arab Emirates to place a moratorium on the importation of elephants from Zimbabwe, effective immediately.

3.      Plaintiffs submitted this Emergency Rulemaking Petition after the acting Environment Minister of Zimbabwe, Savior Kasukuwere, announced that his country would be exporting from the wild upwards of sixty-two baby African elephants to China, the United Arab Emirates, and France. (Since then, Thailand has been added the list of destination countries. France is no longer prepared to buy or transport wildlife products from Zimbabwe).

4.      The proposed export of baby elephant conflicts with the current U.S. policy on international wildlife trafficking.

5.      Prompt implementation of the proposed emergency rule is essential to protect elephants from the hardship of removal from their families, solitary confinement, and overseas transport/relocation, which often results in the death of young elephants.

6.      However, Federal Defendants have failed to make a final decision on Plaintiffs' Emergency Rulemaking Petition.

7.      Plaintiffs have waited a reasonable amount of time for such a response before seeking judicial intervention.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 702-706 (authorizing judicial review by federal district courts of agency inaction).

9. Venue is proper in this Court pursuant to the 28 U.S.C. § 1391(e), as the violations complained of herein occurred in this judicial district.

## PARTIES

10. Plaintiff, Friends of Animals ("FoA"), is a non-profit international advocacy organization incorporated in the state of New York since 1957. FoA seeks to free animals from cruelty and exploitation around the world and to promote a respectful view of non-human, free-living and domestic animals. FoA has approximately 200,000 journal subscribers and members in the United States and internationally. FoA has a long-standing commitment to protecting animals imperiled due to poaching, sport-hunting, and other animal-exploitation markets. Since 1991, FoA has been closely involved in species conservation and recovery projects in Africa, including providing funds and equipment for conservation related projects and to combat poaching on the continent. In particular, FoA members and staff have been actively involved in African elephant conservation for more than twenty years. FoA was one of first organizations to become involved in writing a proposal that encouraged world leaders to impose a worldwide ban on trade in elephant ivory pursuant to the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). FoA has also successfully lobbied against proposals to grant ivory quotas to the African countries of Zimbabwe, Namibia, Botswana and South Africa at the 11th CITES Conference of the Parties held in Nairobi, Kenya, in April 2000. In 2014, FoA established an African Wildlife Advisory Committee, which among other things, works directly with individuals and organizations to conserve African wildlife, including elephants, in their native ranges.

11.     Zimbabwe Conservation Task Force ("ZCTF") is a registered NGO in the Republic of Zimbabwe. ZCTF opened its headquarters in Harare, Zimbabwe, in 2001 under the direction of its founder and chairman, Mr. Johnny Rodrigues. ZCTF works with all sectors of society to promote and ensure the sustainability of African wildlife for current and future generations. ZCTF has continued to expand and is now an established, well known organization in Africa. Most conservation groups left Zimbabwe in the late 1990s, fleeing the country due to internal political strife. ZCTF quickly became one of the foremost wildlife watchdog groups in Zimbabwe. ZCTF works with hundreds of volunteers on the ground and abroad, growing on the faith and passion of all of those committed to saving Zimbabwe's wildlife. ZCTF has also worked to prevent the trade of live elephants, as well as prevent the trade of animals that have been killed. ZCTF has observed firsthand how the lack of adequate government planning and regulation is devastating Zimbabwe's elephants.

12.     Defendant John Kerry is the U.S. Secretary of State, and is sued in his official capacity. Mr. Kerry is responsible for the actions of the Department of State.

13.     Defendant Sally Jewell is the U.S. Secretary of the Interior, and is sued in her official capacity. Ms. Jewell is responsible for the actions of the Department of Interior.

**BACKGROUND**

14.     On January 12, 2015, the acting Environment Minister of Zimbabwe, Savior Kasukuwere, announced that his country would be exporting from the wild upwards of sixty-two baby African elephants to China, the United Arab Emirates, and France. Each elephant sells for approximately $40,000. His announcement is based on Zimbabwe's claim that the country has in excess of 80,000 elephants, but that the country's ecosystem only has the capacity to carry 42,000 elephants. To capture the baby elephants, helicopters hover above the herds and fire shotguns until the herd scatters. The baby elephants that cannot keep up are kidnapped. The captured elephants are usually between two and five years old—a time when they are heavily reliant on their mothers.

15.     In February 2015, a National Geographic report stated, "more than 80 young elephants are being held in a capture facility in Hwange National Park."

16.     In an effort to prevent the capture and condition of the elephants from being made public, the Zimbabwean government has surrounded the capture facilities with guards armed with AK-47s. In addition to keeping this information from news sources, the Zimbabwe government does not want the locals to know about the elephant export plans because they will expect a share of the proceeds.

17.     Not all of the captured elephants belong to Zimbabwe. Many of them are being captured in a national park that borders Botswana and is less than 100 kilometers from Zambia, which makes it very likely that the elephants only spend some of their time migrating through Zimbabwe. These countries rely on having elephants in their own parks and tourist industries and if Zimbabwe unilaterally takes them it will continue to generate tension and controversy between these countries.

18.     Due to the heightened security at the quarantine site it is extremely difficult to determine how many elephants Zimbabwe has exported. Some have estimated that nearly 200 juvenile elephants have been captured and an increasing number are dying as a result of physical and mental abuse.

19.     This action by Zimbabwe comes after the U.S. Fish and Wildlife Service ("FWS") issued a July 22, 2014 determination, pursuant to Section 10 of the U.S. Endangered Species Act, that the sport-hunting of African elephants in Zimbabwe, and the subsequent importation of sport-hunted elephant trophies from that country in to the United States, would not enhance the survival of the species in the wild. In making this determination, FWS found that "Zimbabwe's elephant management plan consists of two outdated documents" and that information on the implementation of those plans and the progress made toward meeting the stated goals and objectives is lacking. *See* Attachment 2.

20.     FWS also found that there is "inadequate information to confirm population status: Zimbabwe does not appear to have adequate information on elephant populations to establish scientifically defensible hunting quotas, particularly in light of the limited information on other means of offtake, such as poaching and problem animal control." *Id*. According to FWS findings, only about 1% of Zimbabwe has been reliably surveyed, and several areas that were covered in more recent surveys (2006-2010) indicate a substantial decline in the elephant population.

21.     Recent reports also indicate that the levels of poaching and the illegal ivory trade started to increase again in the mid-2000s, following an easing in the 1990s, the rate of increase jumping dramatically from 2009. The overall trend indicates an unsustainably high level of elephant takes.

22.     It was noted in both the 15th and 16th meetings of CITES held in 2010 and 2011, that Zimbabwe has both elephant management issues and illicit ivory trade.  The report noted the existence of organized criminal actives within Zimbabwe, including reports of the involvement of politicians, military personnel, and Chinese nationals in illicit wildlife trade.

23.     In light of the overwhelming amount of studies proving the decline in elephant populations in Zimbabwe, it is outrageous for the Environmental Minister to suggest that this exportation has anything to do with population control of elephants.

24.     The need to protect African elephants now is imminent. In addition to the dwindling population, there is also plethora of evidence to show the detrimental impact of Zimbabwe's actions on individual elephants.  Elephants help each other in distress, grieve for their dead, and feel the same emotions–happiness, love, sorrow–for each other just as we do.

25.     Zimbabwe has already torn these babies from their mothers, and currently they are locked in cells, in transit, or being held captive in foreign lands. In all cases, they are lonely, scared and without the protection or care of their mothers.

26.     Despite proven research on the devastating effects of breaking apart family groups, Zimbabwe has failed to provide any information as to why this heartbreaking abduction is necessary.

27.     The Secretary of State and Department of the Interior can help combat the capture and transport of baby elephants by acting on Plaintiffs' Emergency Rulemaking Petition and informing the public about this inhumane travesty, as well as by insisting that China, the United Arab Emirates and Thailand renounce their commitment to Zimbabwe. Further, such statements to the public and the international community will reinforce that the United States of America is not in favor of trafficking baby elephants or supportive of countries with sub-par wildlife management plans that continue to contribute to the eradication of any species under the deceitful guise of "conservation efforts."

28.     Plaintiffs' petition is also consistent with the President's Wildlife Trafficking Advisory Council, which was instructed to strengthen enforcement through interagency cooperation, to educate the public on wildlife trafficking, and to expand international cooperation and commitment. The proposed export of baby elephants conflicts with the current administration's policy on international wildlife trafficking, and the proposed emergency rule is essential to protect elephants from the hardship of removal from their families, solitary confinement, and overseas transport/relocation, which often results in the death of young elephants.

29.     However, Federal Defendants have not made a final decision on Plaintiffs' Emergency Rulemaking Petition.

## CAUSE OF ACTION

30. Petitioners herein incorporate all allegations contained in the preceding paragraphs.

31. Section 553(e) of the Administrative Procedure Act ("APA") provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

32. By failing to respond to Plaintiffs' Emergency Rulemaking Petition, the Federal Defendants have unreasonably delayed agency action. This failure to act is particularly unreasonable given that reports indicate Zimbabwe has already captured baby elephants planned for export, and is holding them in various quarantine facilities where several baby elephants have already died as a result of physical and mental abuse.

33. Federal Defendants' unreasonable delay and failure to act violates the APA, which directs each federal agency to conclude within a reasonable time a matter presented to it. 5 U.S.C. § 555(b).

34. The APA mandates that the Court "shall compel agency action unlawfully withheld or unreasonably delayed."

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment providing the following relief:

A. Declare that the Federal Defendants have violated the APA by unreasonably delaying issuance of a final decision on the Emergency Rulemaking Petition;

B. Order the Federal Defendants to make a final decision on the Emergency Rulemaking Petition within 30 days;

C. Retain jurisdiction of this matter until the Federal Defendants have fulfilled their legal and Court-ordered obligations set forth in this Complaint;

D.      Award Plaintiffs their reasonable fees, expenses, costs and disbursements, including attorneys' fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E.      Grant Plaintiffs such additional relief as the Court deems just and proper.

Dated:  June 4, 2015                                 Respectfully Submitted,

                                                     /s/ Michael Harris
                                                     Michael Ray Harris (DC Bar # CO0049)
                                                     Director, Wildlife Law Program
                                                     Friends of Animals
                                                     Western Region Office
                                                     7500 E. Arapahoe Rd., Suite 385
                                                     Centennial, CO 80112
                                                     Tel: 720.949.7791
                                                     michaelharris@friendsofanimals.org

# ATTACHMENT 1



**NOTICE OF PETITION FOR RULEMAKING**

January 16, 2015

*Via Certified Mail*

Honorable John Kerry
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Honorable Sally Jewell
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Re: Issuance of Policy Statement by the United States Condemning the Export of African Baby Elephants (*Loxodonta africana)* by Zimbabwe

Dear Secretary of State Kerry and Secretary of the Interior Jewell:

On or about January 12, 2015, the acting Environment Minister of Zimbabwe, Walter Mzembi, announced that his country would be exporting from the wild upwards of 62 baby African elephants to China, the United Arab Emirates, and France. His announcement is based on Zimbabwe's claim that the country has in excess of 80,000 elephants, but that the country's ecosystem only has the capacity to carry 42,000 elephants. This move by Zimbabwe comes after the U.S. Fish and Wildlife Service (FWS) issued a July 22, 2014, determination, pursuant to Section 10 of the U.S. Endangered Species Act, that the sport-hunting of African elephants in Zimbabwe, and the subsequent importation of sport-hunted elephant trophies from that country in to the United States, would not enhance the survival of the species in the wild. In making this determination, FWS found that "Zimbabwe's elephant management plan consists of two outdated documents" and that information on the implementation of those plans and the progress made towards meeting the stated goals and objectives is lacking. *See Attachment A.* FWS also found that there is "inadequate information to confirm population status: Zimbabwe does not appear to have adequate information on elephant populations to establish scientifically defensible hunting quotas, particularly in light of the limited information on other means of offtake, such as poaching and problem animal control." *Id*.

NATIONAL HEADQUARTERS • 777 POST ROAD SUITE 205 • DARIEN, CT 06820 • T 203 656 1522 • F 203 656 0267
NEW YORK OFFICE • 1841 BROADWAY SUITE 350 • NEW YORK, NY 10023 • T 212 247 8120 • F 212 582 4482
WILDLIFE LAW PROGRAM • 7500 E. ARAPAHOE ROAD SUITE 385 • CENTENNIAL, CO 80112 • T 720 949 7791 FRIENDSOFANIMALS.ORG

Page 2 of 7

The lack of adequate management of African elephants by the Zimbabwe government is further reported by those on-the-ground in that country who work on wildlife conservation. For example, it has been reported by the Zimbabwe Conservation Task Force that: "the government hasn't done [a countrywide inventory of elephants] since 1997, so we don't think anybody knows exactly how many elephants there are. A count was done in Hwange National Park late last year and 22, 000 elephants were counted there. Hwange has the highest concentration in the country." Moreover, it has been reported that Zimbabwe has already captured baby elephants planned for export, and is holding them in various quarantine facilities. Several baby elephants have already died as a result of physical and mental abuse associated with these "round-ups."

Accordingly, for reasons elaborated upon below, Friends of Animals and the Zimbabwe Conservation Task Force (hereinafter, "Petitioners") submit this emergency rulemaking petition, pursuant to section 553(e) of the Administrative Procedure Act ("APA").[1] Petitioners are "interested persons" under APA section 553(e), and seek emergency issuance of a policy statement by the U.S. State Department and/or Department of Interior: (1) condemning Zimbabwe's plan to export a portion of the countries baby African elephant population to China, the United Arab Emirates, and France as inconsistent with international elephant conservation objectives and goals; (2) calling upon the President of Zimbabwe to halt further implementation of the plan and instead establish an adequate elephant management plan consistent with best available science, international conservation values, and with all relevant international legal authorities and policies; and (3) calling upon China, the United Arab Emirates, and France to place a moratorium on the importation of elephants from Zimbabwe, effective immediately.

## PETITIONERS

### A. Friends of Animals.

Friends of Animals (FoA) is a nonprofit, international animal advocacy organization incorporated in the state of New York since 1957. FoA seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living and domestic animals. FoA has approximately 200,000 journal subscribers and members in the United States and internationally. FoA has a long-standing commitment to protecting animals imperiled due to poaching, sport-hunting, and other animal-exploitation markets. Since 1991, FoA has been closely involved in species conservation and recovery projects in Africa, including providing funds and equipment for conservation related projects and to combat poaching on the continent. In particular, FoA members and staff has been actively involved in African elephant

[1] The APA provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). Under the APA, the term "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . .." 5 U.S.C. § 551(4).

NATIONAL HEADQUARTERS • 777 POST ROAD SUITE 205 • DARIEN, CT 06820 • T 203 656 1522 • F 203 656 0267

NEW YORK OFFICE • 1841 BROADWAY SUITE 350 • NEW YORK, NY 10023 • T 212 247 8120 • F 212 582 4482

WILDLIFE LAW PROGRAM • 7500 E. ARAPAHOE ROAD SUITE 385 • CENTENNIAL, CO 80112 • T 720 949 7791 FRIENDSOFANIMALS.ORG

Page 3 of 7

conservation for more than twenty years. FoA was one of the organizations originally involved in drafting a proposal that world leaders, pursuant to the Convention on International Trade in Endangered Species of Wild Fauna and Flora, impose a worldwide ban on trade in elephant ivory. FoA has also successfully lobbied against proposals to grant ivory quotas to the African countries of Zimbabwe, Namibia, Botswana and South Africa at 11th Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) Conference of the Parties held in Nairobi, Kenya, in April 2000. And in 2014, FoA established an African Wildlife Advisory Committee, which among other things, works directly with individuals and organizations to conserve African wildlife, including elephants, in their native ranges.

**B. The Zimbabwe Conservation Task Force.**

The Zimbabwe Conservation Task Force (ZCTF) is a registered NGO in the Republic of Zimbabwe. ZCTF opened its headquarters in Harhare, Zimbabwe, in 2001 under the direction of Mr. Johnny Rodrigues, founder and chairman of the board. ZCTF works with all sectors of society to promote and ensure the sustainability of African wildlife for current and future generations. Since its inception as a local group, it has expanded as a major player in the conservation of African wildlife. Most conservation groups left Zimbabwe in the late 1990s, fleeing the country due to internal political strife. ZCTF quickly became one of the foremost wildlife watchdog groups in Zimbabwe. ZCTF works with hundreds of volunteers on the ground and abroad, growing on the faith and passion of all of those committed to saving Zimbabwe's wildlife. ZCTF has also worked to prevent the trade of live elephants, as well as prevent the trade of animals that have been killed, and their parts. ZCTF has observed firsthand how the lack of adequate government planning and regulation, as identified in the Enhancement Finding, is devastating Zimbabwe’s elephants.

**STATEMENT OF BASIS FOR THE PROPOSED EMERGENCY RULEMAKING**

**A. The African Elephant.**

**Credit: Michelle Gadd/USFWS**

NATIONAL HEADQUARTERS • 777 POST ROAD SUITE 205 • DARIEN, CT 06820 • T 203 656 1522 • F 203 656 0267
NEW YORK OFFICE • 1841 BROADWAY SUITE 350 • NEW YORK, NY 10023 • T 212 247 8120 • F 212 582 4482
WILDLIFE LAW PROGRAM • 7500 E. ARAPAHOE ROAD SUITE 385 • CENTENNIAL, CO 80112 • T 720 949 7791 FRIENDSOFANIMALS.ORG

Page 4 of 7

According to FWS:

> African elephants (*Loxodonta africana*) can be found across central and southern Africa. The largest land mammal in the world, a bull African elephant can weigh more than 13,000 pounds! African elephants are known to travel in family herds with females and their calves staying together for many years.
>
> For centuries, elephants have been hunted for their tusks, either for trophies or for the art of ivory carving and jewelry making. Although the tusks or teeth of several mammal species (including warthog, walrus, hippopotamus, and several whales) are used as ivory, the tusks from African elephants and Asian elephants (*Elephas maximus*) are most desired by the global ivory market.
>
> The demand for elephant ivory led to devastating declines in the number of these giant animals particularly in the 1970s and 1980s. Despite international efforts to control the ivory trade and stop the decline of elephant populations, prices and demand for ivory remain high, resulting in continued poaching of elephants for their tusks. Poaching and habitat loss are the major threats to African elephants today.

And according to a December 2013 report from the IUCN / SSC African Elephant Specialist Group (attached hereto as Attachment B):

> The results of this analysis show that levels of poaching and the illegal ivory trade started to increase again in the mid-2000s, following an easing in the 1990s, the rate of increase jumping dramatically from 2009. The overall trend appears to be leveling off in 2012 compared to 2011, but at an unsustainably high level.
>
> The [Monitoring the Illegal Killing of Elephants (MIKE)] analysis suggests that 15,000 elephants were illegally killed at the 42 monitored MIKE sites in 2012. The estimated poaching rate of 7.4% in 2012 remains at an unsustainably high level, as it exceeds natural population growth rates (usually no more than 5%). Likewise, the ETIS analysis shows a slight leveling off in the bias-adjusted trend for illegal ivory in 2012. However, a number of countries have not yet reported their 2012 seizures.
>
> * * *
>
> Poverty and weak governance in elephant range States, together with demand for illegal ivory in consuming nations, are the three key factors identified by repeated MIKE analyses, including this one, as being most strongly associated with observed poaching trends.

☐ NATIONAL HEADQUARTERS • 777 POST ROAD SUITE 205 • DARIEN, CT 06820 • T 203 656 1522 • F 203 656 0267
☐ NEW YORK OFFICE • 1841 BROADWAY SUITE 350 • NEW YORK, NY 10023 • T 212 247 8120 • F 212 582 4482
■ WILDLIFE LAW PROGRAM • 7500 E. ARAPAHOE ROAD SUITE 385 • CENTENNIAL, CO 80112 • T 720 949 7791 FRIENDSOFANIMALS.ORG

> Monitoring of elephant populations, apart from at a few well-monitored sites, is sporadic and inconsistent. The low precision of most estimates makes it difficult to detect any immediate repercussion on elephant numbers in the short-term but this does not mean there are no changes.
>
> While it remains to be seen whether the situation is stabilizing, it is clear that international cooperation on law enforcement and public awareness is vital. Improved monitoring is also essential to allow informed decision-making. There is a need for continued and improved reporting to the MIKE and ETIS programmes, as well as improved and more frequent monitoring of elephant populations, including carcass counts wherever possible. The new annual reporting requirement for CITES Parties to provide information on national ivory stockpiles will also provide much-needed information.

In 1978, the African elephant was listed as Threatened under the U.S. Endangered Species Act (ESA). The African elephant was first listed in Appendix III of the CITES in 1976 and moved to Appendix II the following year. In 1990, after nearly a decade during which African elephant populations dropped by almost 50%, the species was moved to Appendix I of CITES. In 1997, some recovering populations were moved back to Appendix II with strict limitations on trade in ivory. U.S. regulations implementing CITES can be found at 50 CFR 23.

Through the African Elephant Conservation Act, passed in 1988 by the U.S. Congress, a moratorium on the import of African elephant ivory was established in 1989. This moratorium, still in place, makes it illegal to import raw African elephant ivory into the U.S. from any country unless certain conditions are met. As a result of this legislation, the African Elephant Conservation Fund was established and Congress has appropriated millions of dollars to the fund since its creation.

**B. The Proposed Removal of 62 Baby African Elephants is Inconsistent with the U.S. Government's Recent Finding that Until Zimbabwe Revises Its Elephant Management Plan, Further Loss of Elephants in Zimbabwe Cannot Be Said to Protect the Species in the Wild.**

On July 17, 2014, the U.S. Fish and Wildlife Service ("FWS") suspended the importation of sport-hunted African elephant trophies taken in Zimbabwe (Fed. Reg. 18013). FWS published an Endangered Species Act enhancement finding (the "FWS Findings") dated July 22, 2014, concluding that the 2014 interim suspension on the import of elephant trophies was based on the limited information provided by Zimbabwe, and FWS found that the killing of elephants for sport does not enhance the survival of the species in the wild.

FWS looked to information provided at various meetings held by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) and by the Zimbabwe Parks & Wildlife Management Authority (ZPWMA). That information, or

lack thereof, did not indicate that Zimbabwe has been appropriately managing their elephant population.  The primary problem being that Zimbabwe has not conducted a reliable population survey since 2001.

The additional information provided by ZPWMA only demonstrated that while "the total population [of elephants] in 2012 was estimated at 100,291, only 47% (47,366) was classified as 'definite' and 45% (45,375) were classified as 'speculative'. Only 304 'definite' animals were counted through sample counts or dung counts, a less accurate methodology than properly conducted aerial surveys.  The remainder were what the [International Union for Conservation of Nature] report called 'other guesses'." The FWS Findings reported that only about 1% of Zimbabwe has been reliably surveyed, and only 50% was covered by sample counts or dung counts, a less robust methodology:

> For a substantial portion of the country, there have been no recent surveys and most estimates are based on 2001 figures. Even areas within Zimbabwe that had expressed higher levels of poaching or human-elephant conflicts . . . do not appear to have been surveyed since 2001.  Several areas that were covered in the current surveys (2006-2010) indicate that there has been a substantial decline in the population.

FWS Findings, pg. 6.

The FWS Findings are in direct conflict with the statements made by the Environmental Minister of Zimbabwe; and while the Zimbabwe government continues to state that elephant population estimates exceed 80,000 elephants, this number is clearly based on either outdated data, or mere guesses.

## C.    The Proposed Removal of Baby Elephants by Zimbabwe Raises Ethical Concerns.

There is a plethora of evidence that elephants help each other in distress, grieve for their dead, and feel the same emotions–happiness, love, sorrow–for each other just as we do.  *See, e.g.*, Ferris Jabar, *The Science Is In: Elephants Are Even Smarter Than We Realized*, Scientific American (Feb. 26, 2014) (attached hereto as Exhibit C).

 Zimbabwe has already torn these babies from their mothers, and currently they are locked in cells, lonely and scared without the protection or care of their mothers. Despite proven research on the devastating effects of breaking apart family groups, Zimbabwe has failed to provide any information as to how this heartbreaking abduction could effectively contribute to the supposed necessary overall reduction in elephant population.

As discussed above, without an accurate population count and other on the ground data, no scientifically based elephant carrying-capacity can be established. As a result, Zimbabwe cannot demonstrate any viable explanation for why the proposed

exportation of these 62 baby elephants could justifiably contribute to proper population management, or why these animals must endure the hardship of removal from their families, solitary confinement, and overseas transport/relocation. It was noted in both the 15th and 16th meetings of CITES held in 2010 and 2011, that Zimbabwe has both elephant management issues and illicit ivory trade. "The report noted the existence of organized criminal actives within Zimbabwe, including reports of the involvement of politicians, military personnel, and Chinese nationals in illicit wildlife trade" (FWS findings, pg. 7). In light of this overwhelming information it is outrageous for the Environmental Minister to suggest that this exportation has anything to do with population control of elephants in Zimbabwe.

**CONCLUSION**

This Petition is fully consistent with and furthers the current administration's policy on international wildlife trafficking (*See Attachment D)*. Indeed, the President's Advisory Council on Wildlife Trafficking Advisory Council was appointed to implement the national strategy. The Council has been instructed to strengthen enforcement through interagency cooperation, to educate the public on wildlife trafficking, and to expand international cooperation and commitment.

The Secretary of State and Department of Interior can help by informing the public about this inhumane travesty, as well as by insisting China, France, and the United Arab Emirates renounce their commitment to Zimbabwe. Further, such statements to the public and the international community will reinforce that the United States of America is not in favor of trafficking baby elephants, further crippling endangered and threatened species' populations, or that supportive of countries with sub-par wildlife management plans that continue to contribute to the eradication of any species under the deceitful guise of "conservation efforts."

We request that the Secretary of State publically release the proposed policy statement to renounce its support of Zimbabwe's plan to export baby elephants.

Respectfully submitted,

Michael Harris
Director, Wildlife Law Program
Friends of Animals
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 80112
Tel: 720.949.7791
michaelharris@friendsofanimals.org

cc: The White House (by email)
The Federal Advisory Council on Wildlife Trafficking (by email)

# Attachment A



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/AIA/DMA

Memorandum

To: The File

From: Chief, Branch of Permits

Date: 7/22/14

Subject: Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014

[This document, originally signed on July 17, 2014, has been revised to make a technical revision to address an editorial error (pages 8 and 11 of the original finding) and to reflect ETIS data from the 16th Meeting of the Conference of Parties to CITES (page 8 of the original finding). These technical revisions did not alter the analysis or decision announced in the July 17 finding.]

This document supersedes the April 4, 2014, "Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014", and the April 17, 2014, revision to that previous document.

The African Elephant (Loxodonta africana) is listed as threatened under the U.S. Endangered Species Act with a special rule [50 CFR 17.40(e)]. The special rule gives the requirements for the import of sport-hunted trophies. Under paragraph 17.40(e)(3)(iii)(C), in order for the U.S. Fish and Wildlife Service (Service) to authorize the import of a sport-hunted elephant trophy, the Service must make a finding that the killing of the animal whose trophy is intended for import would enhance the survival of the species in the wild. In evaluating the available data on elephant hunting in Zimbabwe, the Service has determined that it is unable to make a finding that the killing of elephants in Zimbabwe, after April 4, 2014, whose trophies are intended for importation into the United States, would enhance the survival of the African elephant in the wild. Therefore, the trophies, part or products, of elephants taken in Zimbabwe after April 4, 2014, will not be allowed to be imported into the United States. This finding will be re-evaluated in December 2014 to determine if new information indicates that the killing of animals whose trophies are intended for import would enhance the survival of the species in the wild, including whether sufficient changes have been made in Zimbabwe to allow imports of trophies taken in 2015.

General considerations:

In evaluating whether sport-hunting is contributing to the enhancement of African elephants within a country, the Service looks at a number of factors. The Service evaluates whether a country has a valid national or regional management plan and if the country has the resources and political will to enact the plan. If there is a plan, what government entities implement the plan and how often is it reviewed and updated? Does the plan have clear, achievable objectives? Are the objectives measurable and are they being achieved? Is there an adaptive management approach within the plan so that enacting agencies can quickly respond to changing environmental or social issues?

The Service also evaluates the status of the elephant population and trends over time. Particularly, we are interested in population numbers, sex and age-class distribution, and mortality rates (both natural and man-induced). Are standardized surveys being conducted and, if so, what are the timing, census methodology, and coverage? Since elephant populations can move across international borders, what level of cooperation is there between neighboring countries in management and surveying efforts for shared populations? How is poaching accounted for within survey efforts?

As with any wildlife species, the policies on how the central and regional governments address management efforts, human-elephant conflicts, poaching, and sport-hunting greatly affect the long-term survival of elephant populations. While recognizing that there may be limited resources available for elephant management, the Service considers what national policies are in place to address human-elephant conflicts and problem elephant control. Is there a policy on culling surplus animals and removal of nuisance animals? Is there domestic harvesting of. elephants for local consumption or use? The amount of protected area either set aside for elephants or managed for elephant populations and the level of protection provided is also important in the Service's ability to determine whether imports of trophies could be authorized.

Finally, the Service considers how the sport-hunting program has been incorporated into national/regional management strategies, particularly in light of data on population numbers and trends, levels of utilization (both legal and illegal), and ability to effectiveness of implementing hunting programs, and that the program, and therefore trophies taken in the program, meet the requirements for the import of sport-hunted trophies under paragraph 17.40(e)(3)(iii)(C). Are sufficient funds to address management needs generated through the hunting program? Are the funds dedicated to management efforts or do they go to a general treasury fund? How are hunting quotas distributed? If there are concession areas, how are they managed and allocated?

Basis for Finding for Zimbabwe:

In the April 4, 2014, finding, and the revised finding of April 17, 2014, the Service stated that it was unable to make the positive finding to allow imports primarily due to the limited information available to the Service. At that time, the Service had not received any information in writing from the Zimbabwean Government since a U.S.-inquiry in 2007. At that time, the Service

received a response consisting of three undated and unsigned papers, which seemed to rely on somewhat dated information, and a 1997 elephant management plan. Between that time and April 2014, we had received no additional written information from the Zimbabwean government, but we have received various anecdotal reports and information provided in CITES documents presented at various CITES meetings. Service representatives have met in person with Zimbabwe representatives at various times in the past 6 years, usually in the context of annual meetings of hunting organizations in the United States. Little new or additional information has been provided during those meetings. Therefore, on April 4, 2014, a letter (herein referred to as the Service inquiry) was sent to the Zimbabwe Parks & Wildlife Management Authority (ZPWMA) with a series of questions that would assist the Service in making a final determination on trophy imports. On April 14, 2014, The Director-General of ZPWMA sent a letter to the Service expressing concerns over our decision to establish a temporary suspension. On April 17, 2014, the Director-General sent a response (herein referred to as ZPWMA response) to the Service inquiry. Several weeks later, the Service received a number of additional documents, including copies of Zimbabwean laws, and other supporting documentation that was referenced in the ZPWMA response. In addition, on June 6, 2014, the Service received additional relevant information from Conservation Force, a U.S.-based conservation and hunting NGO. The Service has also received a number of comments from individuals and associations connected to the hunting industry in Zimbabwe or southern Africa. This updated finding is the result of an analysis of this more recent information from Zimbabwe and other sources.

***Management Plans***: In the Service inquiry, the Service asked whether Zimbabwe had a current national management plan for elephants. In the ZPWMA response, Zimbabwe responded that the management plan consisted primarily of The Policy and Plan for Elephant Management in Zimbabwe (1997) and Elephant Management in Zimbabwe, third edition (July 1996). In addition, ZPWMA stated that they also implement other plans: "The African Elephant Action Plan"(CoP15 Inf. 68), SADC Protocol on Wildlife, and Elephant and Rhino Security Plan. In the ZPWMA response, ZPWMA stated that all the protected areas with Zimbabwe have "specific aspects of elephant monitoring programs that are implemented and reviewed on an annual basis." ZPWMA stated that information on the status of the elephant is derived from aerial surveys, water hole counts, walking transects, visitor observation, and ranger-based monitoring. In addition, through the CITES Monitoring of the Illegal Killing of Elephants (MIKE) program in two areas, ZPWMA stated that they are regularly monitoring the status of the elephant population, including poaching.

According to their response, ZPWMA is the sole legal authority, under the terms of the Parks and Wildlife Act, Chapter 20:14, for administering the management plans and overall management of elephants in Zimbabwe. Through an adaptive management approach, ZPWMA stated that aspects of the elephant management plan are "reviewed through annual stakeholder consultative national workshops" with government, NGO, local community, safari operator, and private sector participation.

In Zimbabwe, the elephants range is classified into and apparently managed in four major sub-regions: the Matebeleland north-west, Mid Zambezi Valley, Sebungwe, and South-East Lowveld.

As stated in Elephant Management in Zimbabwe, third edition, there have long been concerns that high elephant concentrations have had a great impact on Savanna ecosystems within Zimbabwe. In 1975, Zimbabwe passed the Parks and Wild Life Act that established National Parks to preserve and protect wildlife and plants and to maintain ecological stability. Until 1989, Department of National Parks, Wildlife, and Land Management (DNPWLM) managed elephant densities in protected areas through culling operations. This practice was drastically reduced due to lack of funds and possibly due to negative public opinion. In 1992-1993, Zimbabwe experienced a major elephant die-off in the Lowveld region due to severe drought conditions. A major culling operation was resumed in this area, where 350 elephants were culled. In addition, DNPWLM conducted a translocation operation where 1,400 elephants were translocated to private conservancies, and about 200 were translocated to South Africa to stock a new Game Park. Despite these efforts to reduce the Lowveld population, 1,500 elephants died due to natural mortality. In 2001, DNPWM was replaced by ZPWMA through an amendment to the Parks and Wild Life Act, Chapter 20:14.

Elephant Management in Zimbabwe provides a historical review of elephant status in Zimbabwe prior to 1996 that establishes a good baseline for ZPWMA. The document also identified three major outcomes: maintain at least four demographically and genetically viable populations; maintain numbers and densities below levels which will not compromise biodiversity; and maintain or increase elephant range at or above 1996 levels. The document, however, primarily focuses on the use of culling as the major approach to management of elephants. While the Service recognizes the value of culling as part of a management program, the current relevance of Elephant Management in Zimbabwe mostly appears to be irrelevant since its focus is primarily culling and Zimbabwe is currently unable or unwilling to implement culling operations. Further, the document does not establish specific measurables or management actions that need to be taken. Instead, it is more of a philosophical discussion on the merits of culling and efforts that must be taken to ensure that culls meet the desired management results. The document did make one relevant statement (although I am sure that there are other salient points made in the document) According to the document, in managing elephant males for sport hunting, it is essential to account for all adult males removed from a population, including animals taken through problem animal control and poaching. The document goes on to state that the "sport hunting quota should be reduced, to zero if necessary, if more than 0.75% of the populations is being killed in other ways."

The Policy and Plan for Elephant Management in Zimbabwe was the outcome of a "Zimbabwe Elephant Management Framework" workshop held on January 13, 1997, in Harare. The document does an excellent job of summarizing the issues that were affecting elephant populations in Zimbabwe at the time, as well as establishing strong policy statements on elephant management. However, while the document makes a clear goal statement and establishes ten objectives with management actions identified, it does not sufficiently expand on any methodology to meet the objectives or complete management actions. Without a plan to take specific actions to meet the objectives, or at least a clear framework on how adaptive management efforts would be monitored to ensure that they are meeting the stated objectives, it is not clear to the Service how this document could serve as a "management plan." Given the general level of stated objectives, it does not appear that the objectives or even the management actions of this 1997 document need

updating to be beneficial, as much as the document needs to be expanded to identify specific measurable outcomes. Further, while the material received from Conservation Force and the ZPWMA as a result of the Service inquiry provided snippets of information that indicate that some aspects of this document are being met, the Service did not receive any meaningful information or consolidated documentation that indicates, since the inception of this document in 1997, which objectives were being met or how.

Other documents provided by ZPWMA because of our inquiry "The African Elephant Action Plan"(CoP15 Inf. 68), SADC Protocol on Wildlife, and Elephant and Rhino Security Plan also establish broad policy goals and objectives, but provide very little specific management actions or measurables. The Zimbabwe Policy for Wild Life is a general framework, published in November 2000, on how ZPWMA would be managed to ensure that Zimbabwe's wildlife and their habitats are appropriately managed. This document specifically acknowledges that "[I]t is intended that [this] policy will be followed by detailed management plans and enabling legislation for those issues which merit them." It is not clear if detailed management plans for elephants have not been developed because ZPWMA does not believe that elephants merit such plans or if detailed plans have been developed, but were not provided to the Service.

Finally, the National Environmental Policy and Strategies, published in June 2009, is a general policy framework for all environmental issues in Zimbabwe. The document, while addressing ways to maintain environmental integrity, social issues, economic issues, and environmental management, establishes "guiding principles" and "strategic directions" for addressing biodiversity (Guiding Principle #9 and 10), flora (#11 and 12), fauna (#13), genetic resources (#14), protected areas(#15), natural resource management (#43), and wildlife and fisheries (#45). However, these guiding principles and corresponding strategic directions are only broad guidance and do not identity any specific management activities.

Without management plans with specific goals and actions that are measurable, the Service cannot determine if ZPWMA is implementing the well-articulated, but general, goals and objectives that appear in Elephant Management in Zimbabwe, The Policy and Plan for Elephant Management in Zimbabwe, and other Zimbabwean policy documents. Overall, ZPWMA did not provide, and the Service otherwise does not have, any information indicating that Zimbabwe is implementing appropriate management of the national elephant populations.

***Population Status***: In order to manage any population to ensure an appropriate population level and determine whether sport hunting is having a positive effect, it is vital to have sufficient data on population numbers and/or population trends to base management decisions. This is particularly the case with elephants and establishing hunting quotas. As stated in Elephant Management in Zimbabwe, sport hunting quotas should be reduced or eliminated if the overall offtake of male elephants, from all sources, is greater than 0.75% of the total population. Without current population data, it is therefore not possible to accurately determine what impact hunting, in conjunction with other offtakes, like problem animal control or poaching is having on Zimbabwe's elephant population.

According to the IUCN SSC African Elephant Database report "2013Africa," the elephant population in Zimbabwe in 2007 was 99,107, of which 85% (84,416) was classified as "definite" and only 0.3% (291) was classified as "speculative". While the total population in 2012 was estimated at 100,291, only 47% (47,366) was classified as "definite" and 45% (45,375) were classified as "speculative". Only 304 "definite" animals were counted by aerial or ground counts, while the remaining 41,840 "definite"' animals were counted through sample counts or dung counts, a less accurate methodology than properly conducted aerial surveys, and the remainder were what the IUCN report called "other guesses". According to this report, half of the population estimates included in 2012 is older than 10 years, resulting in a degradation of the quality of data. Very few new surveys have been conducted since 2007 and of those conducted, only cover a small percentage of the overall population. Further, according to the report, only 8 of estimates used in "2013 Africa" report were the result of repeated surveys. As noted in that report, "this lack of systematic and updated monitoring data is of serious concern for possibly the third largest elephant population in Africa." While the Zimbabwe Government continues to state that elephant population estimates exceeding 100,000 elephants, this number is clearly based on outdated information.

The summary in the IUCN report indicates that, of recent surveys, only about 1% of the country has been covered by more reliable aerial or ground surveys for population estimates, while about 50% was covered by sample counts or dung counts, a less robust methodology. For a substantial portion of the country, there have been no recent surveys and most estimates are based on 2001 figures. Even areas within Zimbabwe that had expressed higher levels of poaching or human-elephant conflicts, such as Hwange National Park, do not appear to have been surveyed since 2001. Several areas that were covered in the current surveys (2006 – 2010) indicate that there has been a substantial decline in the population, whether related to habitat degradation or poaching is unknown.

Recently, according to information provided by ZPWMA, two surveys were conducted in Save Valley Conservancy and in Gonarezhou National Park (and surrounding areas). In Aerial Survey of the Larger Herbivores, Save Valley Conservancy, Zimbabwe, a report compiled in September 2013 by the Technical Advisory Committee of the Save Valley Conservancy, 1,538 elephants were counted. Based on nine years of aerial surveys (2004-2010 and 2012-2013), not all of which covered all of the Save Valley Conservancy, there does appear to be a short-term increase in elephant population density of 9.5%. However, trend analysis of the last three aerial surveys indicated a 2.2% population increase in elephants. Further, the 2012-2013 surveys were only partial surveys and conditions were such that some double counting may have occurred.

In October 2013, aerial surveys were conducted in Gonarezhou National Park, Malapati Safari Area, and adjacent communal lands. From these surveys, it was estimated that there were 10,151 elephants in the Gonarezhou National Park area, the highest estimate since sample surveys began there in 1975. The estimated total number of elephant carcasses in the entire survey was 513. The "1+2" carcass ratio (fresh carcasses (category 1) and recent carcasses (category 2), however, was 0.39% in the entire survey area. The Service recognizes that the increase in elephant population in Gonarezhou National Park is excellent news. However, a carcass ratio of less than 4%, the expected level due to natural mortality alone, is considered unrealistically low. This

unrealistically low number could be an indication that there were problems with the survey.

Figures presented at the 16th Meeting of the Conference of the Parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora in Bangkok, Thailand, March 3-14, 2013 (CoP16 Doc. 53.1) indicates that, from 2002 – 2010, the percentage of illegally killed elephants (PIKE) in Zimbabwe was circa 24%, whereas in 2011 that number jumped to 67%. While the numbers for 2012 and 2013 are not yet available, the trend would indicate a higher percentage of illegal killings and a population in decline.

Although the IUCN "2013 Africa" report speculates that Zimbabwe has the third-largest elephant population in Africa, without current population estimates and a better understanding of the offtake from other sources, like poaching and problem animal control, it is not possible to determine if the total offtake exceeds the recommendation in the Elephant Management in Zimbabwe of 0.75% of the males and whether the hunting quota should be adjusted. With the upcoming Pan African Elephant Aerial Survey, which would cover most of the elephant range within Zimbabwe, a more definitive population estimate can be made, and a more robust carcass ratio could be determined. In conjunction with the 2012 and 2013 PIKE data, a better understanding of the population dynamics within Zimbabwe can be developed. However to provide accurate estimates, the Pan African Elephant Aerial Survey would have to be conducted using the standardized survey protocols and incorporate modern technological improvements, including the use of the latest technological advancement with voice data recordings and geo-referenced digital photographs of all elephant and carcass sightings.

***Regulations and Enforcement:*** Under the Parks and Wild Life Act, Zimbabwe has established the regulatory mechanism for the ZPWMA and its programs. This law includes sections on virtually every aspect of ZPWMA, including requirements for annual financial audits and reporting to the central government. The law also provides for substantial penalties for the unlawful possession of or trading in ivory. The first offense carries a minimum of 5 years and a maximum of 15 years in prison. The second offense carries a minimum prison term of 7 years and a maximum of 15 years. However, according to the response from ZPWMA to our April 4 inquiry, the General Laws Amendment Act (No. 5) of 2010 provides for a mandatory imprisonment of not less than nine years for poaching. If properly enforced, it appears these penalties would be a sufficient deterrent of poaching.

However, based on the information the Service currently has, we do not have a good understanding of the ZPWMA' annual operational budget, how much money is generated by elephant hunting, or how these funds (or the lack of these funds) impact the ability of ZPWMA to adequately enforce the Parks and Wild Life Act, day-to-day management, or anti-poaching efforts and therefore, provide the required enhancement to the species in order for the Service to allow imports under the Elephant special rule. In January 1996, the Government of Zimbabwe approved the establishment of the Parks and Wild Life Conservation Fund, a statutory "Fund" that provides for financing operations directly from wildlife revenues. However, only revenues generated through sport-hunting conducted on state and private lands are used to finance ZPWMA and to our knowledge, no other government funding is provided and only limited outside funding from NGOs or other Governments appears to be available. The 2002 CITES Panel of Experts raised

concerns as to the status of ZPWMA relating to its weak financial base, lack of management skills, inadequate and old equipment, and poor infrastructure. No new information was provided by ZPWMA or other sources as a result of the Service's April 4 inquiry. We have no current information as to the funding level of ZPWMA or any indication that the financial base, management skills, equipment, or infrastructure have improved.

That being stated, the Service did recently receive a document written by Rowan B. Martin entitled "Ban on Import of Elephant Trophies into the USA from Tanzania and Zimbabwe: Part 1: Costs of Protection of Elephant Areas." The undated document discusses the budget requirements for protecting wildlife areas in Zimbabwe based on calculations developed by Mr. Martin in 1996 and 2004. The document states that for Zimbabwe, given the total elephant range within the areas controlled by ZPWMA, the annual budget required to protect the elephant range would be US$21 million. In 2013, ZPWMA requested $28 million from the Treasury, the major part of which was intended for anti-poaching efforts. They were allocated only $1.5 million. According to Martin, this amount, along with the revenue from trophy hunting licenses, is not sufficient to provide the needed level of protection for land under ZPWMA' authority.

At the 15th Meeting of the Conference of the Parties to CITES, a report on the Elephant Trade Information System (ETIS) was presented (CoP15 Doc. 44.1 Annex). In the report, Zimbabwe was specifically identified with regards to management issues and illicit ivory trade. The report noted the existence of organized criminal activities within Zimbabwe, including reports of the involvement of politicians, military personnel, and Chinese nationals in illicit wildlife trade. The report goes on to state that the law enforcement effort ratio within the countries grouped for the analysis had dropped to 40%, a decline of 4% from the CoP14 analysis. This declined indicates a less than average performance and was attributed to the situation in Zimbabwe.

At the 16th Meeting of the Conference of the Parties to CITES, the report on ETIS (CoP16 Doc. 53.2.2)expressed concerns about Zimbabwe in regards to illegal trade in ivory. The report stated that, as a group, Zimbabwe, Botswana, and Namibia, were in the middle range, when compared to 64 other consumer or producer countries of elephant ivory, in terms of the mean number of seizures identified, but ranked fifth in the measure of scale, indicating most of the seizures were in the 10-100 kg class (i.e., an average number of seizures that were predominately smaller in size). The report noted that 65% of the ivory trade between 2006 and 2011 had occurred since 2009, indicating that illegal ivory trade is increasing. Governance indicators were mixed, with a much lower than average World Bank "rule of law" score, but the second highest law enforcement ratio of any group of countries evaluated. The report, however, supports the Services previous concerns regarding Zimbabwe's inability in its governance by specifically identified Zimbabwe as pulling these scores down in both cases, "especially in the "rule of law" score, indicating that far greater challenges exist in that country". The report also noted that Zimbabwe was the source of nearly two tons of worked ivory seized in Cape Town, South Africa in 2009.

In several letters sent to the Service by Zimbabwean safari outfitters and hunting guide organization, it was stated many times that the presence of hunters, specifically U.S. hunters since they appear to make up the vast majority of sport hunters in Zimbabwe, and subsequently the professional hunters and safari outfitters guiding the hunters, is the major deterrent to poaching in

Zimbabwe. Several specific incidents were reported where it was the safari outfitters and hunters, and not the ZPWMA rangers, who thwarted poachers. At least in one incident, the 2013 Hwange National Park poisoning, it was reported that the safari outfitter paid for all of the anti-poaching efforts, including paying for all transportation for the ZPWMA rangers and feeding them. It would be expected that the presence of anyone in the field, particularly armed individuals like hunters, could deter poachers from carrying out illegal activities where the likelihood of being captured is heightened. However, no evidence was presented to the Service that supports the belief that without hunters, specifically U.S. elephant hunters, that poaching in Zimbabwe would become rampant. It is not likely that legal hunting for elephants or other wildlife is not so widespread enough or at a high enough density level to significantly reduce poaching levels in and of itself. This is particularly true for national parks, since legal hunting is not allowed.

The various statements about trophy hunters and outfitters being a major deterrent to poaching does raises the Service concerns about the effectiveness of funds utilization by ZPWMA. Specifically, there are concerns that ZPWMA either is not generating sufficient funds to support adequately their stated mission or is not utilizing the available funding in a manner that supports their stated mission. Without additional information on ZPWMA's funding basis and operating expenses, the Service cannot determine that Zimbabwe has adequate mechanisms to enforce the laws and regulations currently on the books.

***Sustainable Use***: For the 2014 hunting season (January – December 2014), Zimbabwe again has established an export quota of 500 elephants (1000 tusks). This is the same quota that Zimbabwe has reported to the CITES Secretariat since 2004. According to available information, it does not appear that Zimbabwe actually fills this quota each year, but due to variation in how trophies are categorized in CITES trade data, it is difficult to categorically identify the actual numbers of hunted elephants that are exported each year from these data. Information provided by ZPWMA as a result of our April 4 inquiry did not identify the number of trophies exported annually. There were several statements from safari outfitters that referenced a number of approximately 160 elephants taken annually, but this number is not supported by any documentation.

There are six categories of offtake monitored by ZPWMA which include: Cropping (population control, possibly meat supply to rural communities and live animals to breeders), Natural Mortality (found dead of natural causes), Accidents (killed by trains, landmines, or vehicles), Poaching (illegal take), Problem Animals (elephants destroyed to protect human life and property), and Management Offtake (offtake due to other management decisions). Cropping presumably includes sport hunting, though that is not specifically stated in any documents provided. No information was given on the number of elephants that are taken in each of these categories. It does not appear that Zimbabwe is currently conducting any culling operations, besides trophy hunting if considered a "cull". However, culling to remove excess animals is apparently a corner stone of Zimbabwe elephant management practices.

According to information from ZPWMA, 293 elephants were poached in 2013, including the 105 elephants poisoned in Hwange National Park[1]. Of the five years of data ZPWMA provided in

1 In our April 4, 2014, finding, we incorrectly stated that over 300 elephants had been poisoned.

their response, an average of 190 elephants were identified as being poached annually. In 2009 and 2010, there was an average of 111 elephants poached; however, between 2011 and 2013, the average more than doubled to 243 elephants. It is not clear what stimulated this significant increase. Certainly there appears to have been an increase in demand, since many countries appear to have also experienced a marked increase. It is also possible that shifts in land tenure, governance, ZPWMA' limited financial resources, or economic factors contributed to the increase. Further, while the number of animals poached in Zimbabwe does not appear to be as high as in other countries, information that was presented at the 16th Meeting of the Conference of the Parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora in Bangkok, Thailand, March 3-14, 2013 (CoP16 Doc. 53.1) indicates that there has been a steep rise in poaching incidents. Without more accurate population data, like what is anticipated through the Pan African Aerial Elephant Survey, there is no way to determine whether these numbers, combined with other offtake, are sustainable without valid population estimates.

While the number of elephants that are taken as problem animals was not elucidated in material provided by ZPWMA, it is clear from their response and documentation provided by Conservation Force, a large number of elephants are taken each year. ZPWMA reported that in a three-year period (2009-2011), there were 372 human-elephant cases for four "hot spot" districts. It is not clear if elephants were removed in each of these cases. However, there is anecdotal evidence within the information available to the Service that the number of problem animals may equal or exceed the number of elephants taken through sport hunting.

African elephants in Zimbabwe are listed in CITES Appendix II, with an annotation that allows trade in hides. According to CITES trade data, at least 2373 hides were exported in 2010, 3204 in 2011, and 4675 in 2012. It should be noted that these numbers probably do not equate to whole animals, but are the number of parts of hides. Some of these hides may have been obtained from sport hunted trophies, problem animal control, or culling operations. Therefore, it would be impossible to speculate on the number of elephants taken besides the ones taken as trophies or problem animal control. It is clear, however, that some level of offtake in the form of commercial exports of hides is occurring.

According to information from ZPWMA, as well as information provided by many of the comments received by the Service from safari outfitters and professional hunters associations, the principle form of utilization of the elephant in Zimbabwe is sport-hunting. Quotas are apparently set to maximize the sustainable production of high-quality trophies without detriment to the population. However, it appear that the national export quota of 500 elephants is the goal to reach when establishing quotas for each hunting area, as oppose to determining the best quota to facilitate management goals for those areas. According to the material provided to the Service, it appears that the complete quota for 500 elephants is allocated to each area based on recommendations from ZPWMA ecologists, field staff, safari operators, other stakeholders, and technical specialists through "multiple stakeholders participatory quota setting." Apparently, on an annual basis, stakeholders use available population data to propose a particular quota for an area to a Quota Setting Workshop. At this workshop, it is determined if the proposed quota should be adopted or modified in relation to other proposed quotas. Factors that are apparently

considered each year include population estimates, growth rates of populations, size of hunting areas, status of habitat, and target elephant population size.

While the material provided to the Service lays out the general process, the Service did not receive any specific information on how quotas are established. ZPWMA provided the District Quota Setting Toolbox and the Quota Setting Manual, published in 2000 and 1997, respectively. While excellent resource and training material, these documents only provide a general overview of quota setting for all species in Zimbabwe. In establishing a quota, one must take into consideration not only the habitat, population size, and size of the hunting area. One must also take into consideration other offtakes that may be affecting the species you are addressing and other environmental aspects that could influence the species. Nothing that ZPWMA provided addresses these more specific elements. Further, if ZPWMA starts with the premise that the sum of all established quotas must equal the national export quota, it is not clear if the science is driving the quota setting process or the social/economic benefits derived from hunting is the driving force. Finally, without current population data and information on the distribution of elephants across the country, both of which would come from scientifically based population surveys, it would appear that establishing a scientifically viable quota, either higher or lower than previous years, would be impossible. The current quota-setting process utilized by ZPWMA may actually be a very effective system that takes into consideration all of the issues raised in this document, but without documentation of the system, the Service cannot determine if sport hunting quotas are reasonable or beneficial to elephant populations, and therefore whether sport hunting is enhancing the survival of the species.

***Revenue Utilization:*** On communal lands in Zimbabwe, the protection of elephants falls under the Communal Areas Management Programme for Indigenous Resources (CAMPFIRE), which encourages reductions in human-elephant conflicts through conservation-based community development. The program was established in 1989 as a means of providing an economic incentive and return to rural communities while encouraging tolerance for the elephant and sustainable use of natural resources. This program has been the model for community-based conservation efforts in several other African countries and identified as an innovative program in the past. Under this program, there are currently 29 Rural District Councils (RDCs) that have been granted Appropriate Authority status under the Parks and Wild Life Act. There are approximately 13 RDC's with exploitable wildlife resources that make up the core of the CAMPFIRE program. Revenue generated through sport hunting is spent according to decisions taken by RDCs and their constituent communities. ZPWMA provides guidelines for the distribution of these funds between administrative costs, cost of wildlife management, and returns to communities in wildlife areas.

The CAMPFIRE program has come under criticism relating to excessive retention of generated funds by district councils which has resulted in diminished benefits being realized by the communities it was designed to help. Information supplied by the CAMPFIRE Association to the CITES Panel of Experts in 2002 indicates that this situation may be improving. The information that was provided to the Service after its April 4 inquiry does not, however, support or refute this statement. Under a community-based conservation program, like CAMPFIRE, rural communities should benefit from revenue generated by sport-hunting. With increased

human-elephant conflicts on communal lands, sport-hunting may be an important tool which gives these communities a stake in sustainable management of the elephant as a natural and economic resource. However, without current information on how funds are utilized and the basis for hunting off-takes, the Service is unable to confirm this assumption.

***Local conservation efforts***: Much of the information provided by Conservation Force and other commenters addressed the economic impact of the suspension to local conservation efforts being carried out by individual landowners or lease-holders, safari outfitters, and conservancies. It is clear that outstanding conservation work is being carried out in some areas that is funded solely or in major portions by private individuals or companies. It is also clear that these individuals may be impacted by a suspension of elephant trophy imports. However, it is unknown whether and to what extent these individuals would reduce their conservation efforts based on the inability of U.S. hunters to import a sport-hunted trophy. In addition, the information available to the Service on the conservation works being carried out by non-governmental entities, at this time, appears to be limited to a small group of situations and is not the norm for Zimbabwe as a whole. While these pockets of conservation are greatly needed, there does not appear to be a mechanism in place, such as government support, tax incentives, or land tenure security, to promote or sustain these efforts across Zimbabwe's elephant range. Therefore, the Service cannot determine that these limited, but seemingly important, activities would are provide the enhancement required under the ESA to allow imports of trophies taken throughout Zimbabwe.

***Summary***: When the Service announced the interim suspension on the import of elephant trophies from Zimbabwe on April 4, we based the decision on the limited information available to the Service at that time. In response to an April 4 letter to the Government of Zimbabwe, we received a large amount of information directly from ZPWMA. In addition, we received information from Conservation Force and a number of safari outfitters and professional hunter associations. Some of the information did indicate that hunting in Zimbabwe was providing a benefit to elephants, while other information raised questions that were not answered. Based on all of this information, we determined we are unable to find that the killing of an elephant whose trophy is intended for import would enhance the survival of the species in the wild due to the following factors:

- Zimbabwe's current elephant management plan consists of two primary documents drafted in 1996 and 1997. Although the documents provide a well-developed list of goals and objectives, there is no information on whether these goals and objectives have been met or could ever be met. Without information on how the strategies are being implemented, the Service cannot determine that the plans provide sufficient basis for making the required enhancement finding.

- Until the Pan African Elephant Aerial Survey is conducted to confirm or deny current population estimates, it does not appear that Zimbabwe has adequate information on elephant populations to establish scientifically defensible hunting quotas, particularly in light of the limited information on other means of offtake, such as poaching and problem animal control.

- While Zimbabwe has laws and corresponding regulations in place to address elephant management, there appears to be an inability due to either limited funding or inadequate governance to implement and enforce these laws. Further, since the central Zimbabwean Government is not allocating funding to ZPWMA and the vast majority of funding must come from hunting revenues, it appears that ZPWMA does not have the financial resources needed to adequately address elephant conservation and management needs. Lastly, it is unknown to the Service what efforts Zimbabwe is taking to rectify this situation.

- According to information provided, Zimbabwe has established hunting quotas for all areas of the country. However, the Service did not receive specific information on how these quotas are established, whether other forms of offtake, such as poaching and problem animal control, were taken into account, or what level of input biological factors are taken into consideration (as oppose to economic and societal considerations).

- While CAMPFIRE has provided strong conservation benefits in the past by promoting greater tolerance of wildlife in rural communities, the program has more recently come under criticism relating to excessive retention of generated funds by district councils, resulting in diminished benefits to communities. The information provided the Service after its April 4 inquiry did not support or refute this statement. With increased human-elephant conflicts on Communal lands, sport-hunting may be an important tool which gives these communities a stake in sustainable management of the elephant as a natural and economic resource. However, without current information on how funds are utilized and the basis for hunting off-takes, the Service is unable to confirm whether revenue generated through sport hunting actually provides an incentive to local communities to conserve elephants.

- There are clearly "bright spots" of elephant conservation efforts, carried out by non-governmental entities, scattered around Zimbabwe that are providing a benefit to elephants. However, there are not enough of these "bright spots" to overcome the problems currently facing Zimbabwe elephant populations and to support a finding that sport hunting is enhancing the survival of the species. Without more support from the Central Government and Rural District Councils, these efforts are not likely to be fully successful or to compensate for the management deficiencies described above.

Therefore, with the exception of elephants that were harvested before April 4, 2014, the date of the announcement of the temporary suspension, no elephants harvested during 2014 may be imported into the United States.

# Attachment B





# Status of African elephant populations and levels of illegal killing and the illegal trade in ivory:

## A report to the African Elephant Summit

## December 2013

Prepared by:

CITES Secretariat
IUCN / SSC African Elephant Specialist Group
TRAFFIC International






**Acknowledgements:**

IUCN is grateful to the following donors who have supported either core costs of the AfESG, or specifically contributed to the preparation of this report: Bundesamt für Naturschutz (Germany); Department for Environment, Food and Rural Affairs (UK); the European Union, through the CITES Secretariat and its MIKE programme; International Elephant Foundation; International Fund for Elephant Conservation; Save the Elephants; Tusk Trust; the United States Fish & Wildlife Service; the United States Agency for International Development and its W-TRAPS programme; and the World Bank.

The CITES Secretariat is grateful to the European Union for its financial support to the MIKE Programme. The Secretariat would also like to express its gratitude to all the rangers, MIKE site officers and national officers from participating sites and range States, as well as external data providers, without whose contribution the MIKE contribution to this report would not have been possible.

ETIS thanks the European Union through the CITES Secretariat and its MIKE programme, the U.K. Department of Environment, Food and Rural Affairs (Darwin Initiative), the U.S. Fish & Wildlife Service (African Elephant Conservation Fund) and WWF.

Finally, the members of the AfESG Data Review Working Group and the MIKE-ETIS Technical Advisory Group are thanked for their technical support.

   

 

  

**Disclaimer**

The contents of this report do not necessarily reflect the views or policies of the donors or contributing organisations. The designations employed and the presentations do not imply the expressions of any opinion whatsoever on the part of the contributing organisations concerning the legal status of any country, territory, city, company or area or its authority, or concerning the delimitation of its frontiers or boundaries.

## Introduction

The IUCN/SSC African Elephant Specialist Group (AfESG) works with the two CITES-mandated elephant monitoring systems: the programme for Monitoring the Illegal Killing of Elephants (MIKE), managed by the CITES Secretariat, and the Elephant Trade Information System (ETIS), managed by TRAFFIC, to bring together updated and critical information and data on elephants, poaching and the illegal ivory trade in an integrated manner. Consolidated reports, including inputs on Asian elephants from the IUCN/SSC Asian Elephant Specialist Group, on legal ivory trade by UNEP-WCMC, and implementation of the African Elephant Action Plan, have been provided to the 61st and 62nd meeting of the Standing Committee to CITES. These updates, along with the 2013 report, “Elephants in the Dust” have provided comprehensive and up to date information to elephant conservationists, managers, and policy makers.

This update includes data from 2012 on elephant populations, levels of illegal killing, and levels of illegal trade in ivory.

## Executive Summary

The results of this analysis show that levels of poaching and the illegal ivory trade started to increase again in the mid-2000s, following an easing in the 1990s, the rate of increase jumping dramatically from 2009. The overall trend appears to be leveling off in 2012 compared to 2011, but at an unsustainably high level.

The MIKE analysis suggests that 15,000 elephants were illegally killed at the 42 monitored MIKE sites in 2012. The estimated poaching rate of 7.4% in 2012 remains at an unsustainably high level, as it exceeds natural population growth rates (usually no more than 5%). Likewise, the ETIS analysis shows a slight leveling off in the bias-adjusted trend for illegal ivory in 2012. However, a number of countries have not yet reported their 2012 seizures.

The overall weight and number of large-scale ivory seizures (more than 500kg) in 2013 exceeds any previous year in the ETIS data. These data have not been bias-adjusted, and the increase may reflect enhancement of law enforcement effort, or could signify an increase in overall levels of illegal trade. With the high levels of poaching being observed through the MIKE programme, the amount of illegal ivory in trade should be expected to remain high.

Poverty and weak governance in elephant range States, together with demand for illegal ivory in consuming nations, are the three key factors identified by repeated MIKE analyses, including this one, as being most strongly associated with observed poaching trends.

Monitoring of elephant populations, apart from at a few well-monitored sites, is sporadic and inconsistent. The low precision of most estimates makes it difficult to detect any immediate repercussion on elephant numbers in the short-term but this does not mean there are no changes.

While it remains to be seen whether the situation is stabilizing, it is clear that international cooperation on law enforcement and public awareness is vital. Improved monitoring is also essential to allow informed decision-making. There is a need for continued and improved reporting to the MIKE and ETIS programmes, as well as improved and more frequent monitoring of elephant populations, including carcass counts wherever possible. The new annual reporting requirement for CITES Parties to provide information on national ivory stockpiles will also provide much-needed information.

**African elephant population status**

*Introduction*

The IUCN/SSC African Elephant Specialist Group maintains the African Elephant Database, available online at the African and Asian Elephant Database[1]. Five comprehensive updates have been published in 1995, 1998, 2002, 2007 and provisionally in 2013 (http://elephantdatabase.org). All populations of African elephant have been listed on CITES Appendix I since 1989, except for four national populations that were transferred to Appendix II (Botswana, Namibia and Zimbabwe in 1997, and South Africa in 2000). The African elephant is currently listed as Vulnerable (A2a; Ver 3.1; Blanc, 2008) on the IUCN Red List.

African elephants are assumed to have been widely distributed south of the Sahara prior to colonial times. Today, African elephants are believed to occur in 35-38 range States. Their continued presence in Senegal, Somalia, and Sudan remains uncertain. The distribution of elephants varies considerably across the four regions, with small fragmented populations in West Africa and large tracts of range remaining in Southern Africa. While this document outlines the serious threat posed to African elephants from poaching and the illegal ivory trade, range and habitat loss remain a significant long-term threat to the species' survival.

*Population trends*

It is very difficult to track trends at the continental level, let alone at the national level. Elephant surveys are seldom conducted at regular intervals, and never systematically across the range or even across a particular country. Surveys of the same site are sometimes conducted using different techniques, making comparability even at the site level challenging. Additional challenges come with the time lag between the survey being conducted and the reporting of the results of that work. Despite these difficulties, the AfESG hopes to begin exploration of different options for discerning and analysing trends in elephant populations.

*Continental overview*

The status and reliability of information on elephant populations varies dramatically across African elephant range. In the most recent update, the quality and reliability of data for Central Africa has improved, while there has been a reduction in the overall reliability of data in Southern Africa and in parts of Eastern Africa. Southern Africa continues to hold the lion's share of Africa's elephants, holding close to 55% of the known elephants on the continent. Eastern Africa holds 28% and Central Africa 16%. In West Africa, less than 2% of the continent's known elephants are spread out over the remaining 13 elephant range States. The subregional breakdown of numbers is available in Figure 1.

*Subregional summaries*

In Central Africa, Congo, the Democratic Republic of Congo, and Gabon hold the majority of the subregion's known elephants. Comparable surveys have only been conducted in a few sites in Central Africa. Declines have been observed in a number of Parks in Central Africa, in particular Bayang-Mbo Wildlife Sanctuary in Cameroon, Zakouma National Park in Chad, and Odzala Kokoua National Park in Congo. A recent modeling exercise suggested that there could have been a greater than 60% decline in elephant numbers across Central Africa in the last 10 years (Maisels et al, 2013).

The majority of Eastern Africa's known elephants are in Tanzania and Kenya. Across the subregion, there have been a number of comparable surveys, but at an aggregated level, no statistically significant differences have been observed. In Southern Africa, Botswana holds by far the largest population in the subregion and on the continent. Mozambique, Namibia, South Africa, Zambia and Zimbabwe still hold large elephant populations. Data is scanty in Angola and smaller populations persist in Swaziland (where elephants were reintroduced in the 1980s) and Malawi. A small number of comparable surveys were

[1] http://elephantdatabase.org.

conducted in Southern Africa. While numbers appear to be increasing in Namibia and South Africa, there appear to be some initial declines in some of the populations in Zimbabwe and Zambia.

Finally in West Africa, there are very few new surveys to report. The largest elephant population can be found in the transboundary WAPOK complex in Benin, Burkina Faso, Niger and Togo. Only three comparable surveys were conducted in the past 5 years, and these surveys do not show any change in numbers in those sites.

*Figure 1. Subregional summary of elephant numbers (www.elephantdatabase.org)*

*Elephant conservation action plans and strategies*

In 2010, the African Elephant Action Plan (AEAP) was adopted by a consensus of all the African elephant range States. An African Elephant Fund has been put in place to help fund the implementation of the AEAP and has given a number of grants through two funding rounds. At the subregional level, regional action plans are in place in Central, Southern, and West Africa. National action plans and strategies have been adopted by 15 countries in the last ten years. The list of strategies is available in Table 1.

*Table 1. Strategies & management plans*

| **African Elephant Action Plan (2010)** | | | |
|---|---|---|---|
| **Central Africa** | **East Africa** | **Southern Africa** | **West Africa** |
| • Strategy for the Conservation of Elephants in Central Africa (2005)<br>• Cameroon (2010) | • Kenya (2012)<br>• Tanzania (2012) | • Southern Africa Regional Elephant Conservation and Management Strategy (2005)<br>• Botswana (2003)<br>• Mozambique (2010)<br>• Namibia (2007)<br>• Zambia (2003) | • Strategy for the Conservation of West African Elephants (2005)<br>• Convention on Migratory Species West African Elephant Memorandum of Understanding (2005)<br>• Benin (2005)<br>• Burkina Faso (2003) |

| | | | |
|---|---|---|---|
| | | | • Cote d'Ivoire (2004)<br>• Ghana (2000)<br>• Guinea (2008)<br>• Guinea-Bissau (2000)<br>• Niger (2010)<br>• Togo (2005) |

**Trends in the illegal killing of elephants and its impact on elephant populations**

*Introduction*

The CITES programme for Monitoring the Illegal Killing of Elephants, commonly known as MIKE, was established by the Conference of the Parties (CoP) at its 10th Meeting (Harare, 1997) in accordance with the provisions in Resolution Conf. 10.10 (Rev. CoP16) on *Trade in elephant specimens*. The MIKE programme is managed by the CITES Secretariat under the supervision of the CITES Standing Committee and implemented in collaboration with IUCN. Since implementation began in 2001, MIKE has benefitted from the generous financial support of the European Union.

MIKE aims to inform and improve decision-making on elephants by measuring trends in levels of illegal killing of elephants, identifying factors associated with those trends, and by building capacity for elephant management in range States. MIKE operates in a large sample of sites spread across elephant range in 30 countries in Africa and 13 countries in Asia. There are some 60 designated MIKE sites in Africa, which include many of the continent's prime National Parks—such as Chobe, Etosha, Kruger, Ruaha, South Luangwa and Tsavo—as well as some of its most famous Game Reserves, such as Selous and Niassa. Taken together, the elephant population at MIKE sites is estimated to represent 30 to 40% of the continental elephant population.

MIKE data comes from the information received from ranger patrols and other sources in designated MIKE sites. When an elephant carcass is found, rangers identify the cause of death and other details and fill in standardized carcass forms that are then submitted to the MIKE programme. A database of more than 11,000 carcass records has been assembled so far, providing a substantial information base for statistical analysis.

MIKE evaluates relative poaching levels based on the Proportion of Illegally Killed Elephants (PIKE), which is calculated as the number of illegally killed elephants found divided by the total number of elephant carcasses encountered by patrols or other means, aggregated by year for each site. Coupled with estimates of population size and natural mortality rates, PIKE can be used to estimate numbers of elephants killed and absolute poaching rates.

While PIKE provides a sensitive measure of poaching trends, it may be affected by a number of potential biases related to data quality, carcass detection probabilities and other factors, and hence results need to be interpreted with caution. However, the fact that the quantitative results presented below are in good agreement with quantitative information available from the Elephant Trade Information System (ETIS), as well as with qualitative information from the IUCN/SSC African elephant Specialist Group, gives confidence as to the robustness of the results.

*Trends and levels of illegal killing and impact on elephant populations*

Figure 2 shows empirically derived time trends in PIKE at the continental level for African MIKE sites, with error bars (95 % confidence intervals). The data show a steady increase in levels of illegal killing of elephants starting in 2006, with 2011 displaying the highest levels of poaching since MIKE records began in 2002. In 2012 and the first six months of 2013, the trend seems to flatten out at levels close to those recorded in 2011. PIKE levels have been above 0.5 in 2011, meaning more than half of elephants found dead were deemed to have been illegally killed.



*Figure 2. PIKE trends in Africa with 95 % confidence intervals.*
*The number of carcasses on which the chart is based is shown at the bottom of the figure.*

Differences in poaching levels between the different African subregions are evident in Figure 3, with Central Africa consistently showing the highest overall poaching levels, in contrast with Southern Africa, which shows the lowest overall levels. In Eastern Africa, which has contributed the largest number of carcass records, the trend is very similar to the continental one. West Africa has the smallest elephant population and has submitted the smallest number of records. As a result, there is a high level of uncertainty around PIKE estimates in that subregion, which makes it difficult to determine the trend. Nevertheless, increases in PIKE levels are apparent in all four African subregions in the second half of the period. PIKE levels in 2012 are mapped in Figure 4.



*Figure 3. Subregional PIKE trends with 95 % confidence intervals.*
*The numbers of carcasses on which the graphs are based are shown at the bottom of each graph.*



*Figure 4. PIKE levels by MIKE site in 2012.*

*Factors associated with levels of illegal killing*

The MIKE programme has statistically evaluated relationships between PIKE levels and a wide range of ecological, biophysical and socio-economic factors at the site, national and global levels. Three such factors consistently emerge as very strong predictors of poaching levels and trends: poverty at the site level, governance at the national level and demand for illegal ivory at the global level. The quantitative relationships between PIKE and these factors are illustrated in Figure 5.

Human infant mortality in and around MIKE sites, which is interpreted as a proxy for poverty at the site level, is the single strongest site-level correlate of PIKE, with sites suffering from higher levels of poverty experiencing higher levels of elephant poaching. This suggests that there may be a greater incentive to facilitate or participate in the illegal killing of elephants in areas where human livelihoods are insecure. Furthermore, this relationship highlights a close linkage between the well being of people and that of the elephant populations with which they coexist.

At the national level, the strongest correlate of PIKE is governance, as measured by Transparency International's Corruption Perceptions Index (CPI). High poaching levels are more prevalent in countries where governance is weaker, and vice versa. This is likely to be a causal relationship, with poor governance facilitating the illegal killing of elephants and movement of illegal ivory, be it through ineffective law enforcement or active aiding and abetting by unscrupulous officials.

Ultimately, the illegal killing of elephants for ivory is driven and sustained by demand from consumers who are willing to pay for illegal ivory, as measured by household consumption in China. ETIS analyses indicate that, in recent years, China has become the world's largest consumer of illegal ivory. This is corroborated by the fact that that temporal PIKE trends are strongly related to patterns in consumer spending in that country. This relationship does not hold for other traditional destination markets for ivory (Europe, USA or Japan) or for countries known to be important transit points in the ivory trade chain (Malaysia, Philippines, Thailand or Viet Nam). Temporal PIKE trends are also strongly correlated with another demand-related variable, namely trends in large-scale ivory seizures as reported by ETIS.



*Figure 5. Relationships between PIKE and poverty, governance and demand covariates. For each graph, all other covariates are held constant at their means. Dotted lines represent confidence bands.*

These three factors — poverty, governance and demand — explain nearly two thirds of the variation observed in PIKE levels across African sites. Poverty and governance explain spatial patterns in poaching levels, while demand accounts for the temporal trend. Whilst the empirical relationships demonstrated by the MIKE analyses are not necessarily directly causal, they do provide a good basis from which to investigate causation. At the very least, the factors identified in the MIKE analysis are likely to facilitate or to provide incentives for the illegal killing of elephants and the illegal trade in ivory.

*The impact of poaching on elephant populations*

A statistical model based on the variables discussed above can be used to estimate absolute poaching rates, as well as the number of elephants killed in a given year. Modelled PIKE levels for 2012 translate to an estimated 15,000 elephants illegally killed across all African MIKE sites in that year alone, or about 7.4% of the total elephant population in those sites. As elephant populations seldom grow at more than 5% *per annum*, the model suggests that this level of offtake would imply that the overall population in MIKE sites is likely to have declined by around 2.4% in 2012.

As Figure 6 shows, the model estimates that the threshold of sustainability was crossed in 2010, with poaching rates remaining above the population growth rate threshold ever since. It is therefore likely that populations at MIKE sites may be in net decline since 2010. However, this does not mean declines at every site, merely a decline on average. No attempt has been made to extrapolate these estimates beyond MIKE sites; data from additional sites would be needed to calibrate the model.



*Figure 6. Estimated absolute poaching rates as predicted by the model. The dotted line denotes the annual growth rate of healthy populations (5%). Poaching rates exceeding this growth rate imply net population declines.*

## **Trends and Developments in the Illegal Trade in Ivory**

*Introduction*

The Elephant Trade Information System (ETIS) holds the world's largest collection of elephant product seizure records from 1989 to the present. Of the 20,708 records in ETIS, 14,070 separate raw or worked ivory seizures in 72 countries or territories were used for this trend analysis covering the period 1996-2012. 1996 is the last full year in which all African Elephant populations were listed in CITES Appendix I. The data used in this analysis comprise 2,437 more records than the trend analysis presented at CITES CoP16 in March 2013 (see Milliken *et al.*, 2012).

Figure 7 depicts the raw data in ETIS, showing the number of seizure cases and the estimated weight of ivory seized in each year since 1989. Because of inherent bias in the raw data, this figure should not be interpreted as a trend, nor is it suggestive of absolute trade quantities over time. With only 206 records, 2013 was data deficit and does not feature in this trend analysis, but will be discussed separately as these data already constitute a considerable quantity of ivory.



*Figure 7. Estimated weight of ivory and number of seizure cases by year, 1989 - 2013 (ETIS 14 October 2013)*

*The trend analysis*

Methods:

The methodology used for the trend analysis is described in Underwood *et al.*, 2013 which was also used to produce the ETIS trends presented at CITES CoP16. In this regard, the data were assessed according to ivory type, raw or worked, in three separate weight classes: less than 10 kg; between 10 kg and less than 100 kg; and greater or equal to 100 kg. The data were then adjusted for bias using a statistical estimation of relative 'seizure rates' and 'reporting rates' for each country/territory for each year, and then smoothed to reduce anomalies not indicative of overall patterns.

The Transaction Index – assessing the frequency of illegal trade in ivory:

The Transaction Index in Figure 8 is a relative measure of global illegal ivory trade activity over the last 17 years. In this representation, 1998, the year before the first one-off sale under CITES, is the baseline and has been set to 100. The best estimate of the trade in each year is indicated by the bold dot, while the vertical lines depict 90% confidence limits. Overall, the confidence limits remain tight, with the exception of the 2011 and 2012 results, but it is worth noting that for both 2010 and 2011 the degree of uncertainty is now less than the estimate for those years presented in the CITES CoP16 analysis. Whilst the data for 2011 are now more complete, and there is an additional year to help "fix" these results more confidently, 2012 still represents a somewhat incomplete data set and is the last year in this sequence, which characteristically gives rise to a more uncertain status.



*Figure 8. Estimate of illegal ivory trade activity, 1996 - 2012, showing 90% confidence intervals (ETIS Transaction Index, 14 October 2013)*

The overall trend is remarkably consistent with the CITES CoP16 results, with 2011 representing nearly three times as much illegal ivory trade as 1998, and 2010 almost twice as much activity. Illegal ivory trade activity in 2012 is two and a half times greater than 1998 levels even though a slight decrease since 2011 is suggested.  However, as the 90% confidence intervals for these last two years mostly overlap, trade activity in 2012 is believed to have remained remarkably stable at a high level. This interpretation is further buttressed by the fact that the 2012 data represent 30% fewer seizure records than 2011, but the mean Transaction Index value for 2012 is only 10% less than that for 2011. Illegal ivory trade activity has remained robust, and thus worrisome, throughout 2012.

Looking more precisely at what has changed since 2011, Figure 9 presents the patterns of trade activity found for each of the ivory weight classes. In general terms, the raw ivory trade is associated with the movement of ivory between, through and from African elephant range States to transit countries/territories and then on to centres of processing which are most often in Asia. Worked ivory trade transactions relate to the consumption of ivory in markets in Africa, Asia and other parts of the planet, including the tourist curio trade whereby worked ivory items are transported all over the world. In terms of raw ivory transactions, continuation of the decline in small raw ivory transactions that first appeared in 2011 is evident, whilst the increasing pattern of the medium raw ivory class shows further growth which suggests greater aggregation of ivory in trade and probably accounts for the decline in small raw ivory transactions to some extent. There is evidence of a decline in large raw ivory transactions in 2012, compared with 2011. This decrease might be explained by time lags in terms of assembling large consignments of ivory as the average weight of seizures over 500 kg increased by some 15% during this period from the previous year, according to available data (Table 2). The 2012 drop in the small worked ivory class, which makes the greatest contribution to illegal ivory trade activity in each year, is probably less of a factor when the confidence interval is considered as it generally overlaps with that for 2011. The medium worked ivory class, however, seems to represent a greater actual decline, whilst the large worked ivory class indicates some level of increase although, again, the confidence interval is very large so there is less certainty about the trend in this ivory class.



*Figure 9: Estimate of illegal ivory trade activity for each ivory class, 1996 - 2012, showing 90% confidence intervals (ETIS Transaction Index, 14 October 2013)*

<u>The Weight Index – assessing the scale of illegal trade in ivory</u>

Figure 10 presents an estimate of the mean weight for all ivory classes by year with 1998 set to 100. This figure represents relative (not absolute) values for the quantity of ivory being traded illegally so the pattern, more than the relative weights, is what is noteworthy. Overall the Weight Index and the Transaction Index are very similar. There is relative stability in the quantity of ivory in illegal trade through 2007, but thereafter a fairly sharp upward climb is seen, although a drop is indicated in 2012. Again, confidence limits for the latter two years are considerable (not depicted in the figure) and there is less certainty regarding the mean estimates, suggesting that the decrease may not be significant and the trade actually remains fairly stable at a high level. The large raw ivory class contributes the most to the Weight Index, which is consistent with CITES CoP16 results whereby large-scale ivory seizures were noted as driving the upward ivory trade trend. Again, the quantity of illegal ivory in trade in 2011 is estimated to be nearly three times the level that was going into trade in 1998, whilst 2012 represents about two and a half times more.



*Figure 10. Mean estimate of the weight of illegal ivory trade combining all weight classes by ivory types, 1996 - 2012 (ETIS Weight Index, 14 October 2013)*

*Assessment of large-scale ivory seizures and trade routes*

The frequency of large-scale ivory seizures, in which 500 kg or more of raw or worked ivory (in raw ivory equivalent terms[2]) is seized through a single law enforcement intervention, has increased greatly since 2000. Prior to 2009, an average of five and never more than seven such events occurred each year but, from 2009 onwards, an average of 15 and as many as 21 large-scale ivory seizures have taken place each year, according to the ETIS data (Figure 11). Table 2 presents summarised data on the 76 large-scale ivory seizures which occurred from 2009 through 15 November 2013. Although 2013 is still data deficient and not included in the trends analysis, already 18 large seizures have yielded a greater quantity of ivory than any other previous year going back to 1989. Whether this constitutes an increase in actual illegal trade volumes or reflects improved law enforcement in particular countries/territories is best ascertained using bias adjusted data in a future trends analysis using the methodology described in Underwood *et al.*, 2013. We do know, however, from using bias adjusted data to estimate trends, that the upward surge in terms of the weight of ivory seized from 2009 through 2011, does represent increased illegal activity that is being driven by seizures in the large ivory weight class. Further, as previously described (Milliken *et al.*, 2012), such seizures are indicative of the presence of organised crime in the illicit ivory trade and often involve Asian-run, Africa-based sourcing of ivory. In this regard, the raw data on large-scale ivory seizures represent the salient evidence of ivory trade crime orchestrated by transnational criminal operatives. Because large-scale seizures of ivory typically generate media

[2] Raw ivory equivalent values result from converting worked ivory products into raw ivory values to account for the loss of ivory during processing so that the weights of raw and worked ivory can be meaningfully combined for analytical purposes.

coverage and become known soon after they occur, tracking them serves as a kind of crude earlyindicator of the illicit ivory trade as a whole. For this reason, the 2013 data are regarded with considerable alarm and could be an indication that the illegal trade in ivory is continuing to increase. A more definitive assessment of this issue will be possible at a future time when the trends analysis is extended to include 2013.

*Figure 11. Number of large-scale (>500 kg) ivory seizures by year, 2000 - 2013 (ETIS 15 November 2013)*

*Table 2.Number and weight of large-scale (>500 kg) ivory seizures by year and mode of transport, 2009 - 2013 (ETIS, 15 November 2013)*

| Year | Air | | Sea | | Land | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Number | Weight | Number | Weight | Number | Weight | Number | Weight |
| 2009 | 3 | 2,364 | 7 | 15,915 | 3 | 3,898 | 13 | 22,177 |
| 2010 | 4 | 6,390 | 6 | 8,035 | 1 | 616 | 11 | 15,041 |
| 2011 | 3 | 3,808 | 16 | 27,939 | 2 | 3,084 | 21 | 34,831 |
| 2012 | 1 | 601 | 9 | 17,683 | 3 | 6565 | 13 | 24,849 |
| 2013 | 1 | 797 | 11 | 31,069 | 6 | 9,808 | 18 | 41,674 |
| Total | 12 | 13,960 | 49 | 100,641 | 15 | 23,971 | 76 | 138,572 |
| % | 0.16 | 0.10 | 0.64 | 0.73 | 0.20 | 0.17 | | |

*Note: The data presented in this table cover a different time period to that depicted in Figure 11 above, with the 2013 data here representing additional seizures that occurred between 14 October and 15 November 2013.*

About two-thirds of the large ivory seizures by number, and three-quarters by weight, are transpiring as containerised shipping through seaports. This presents a major challenge to effective law enforcement as only a small percentage (less than 5%) of the containers in trade are actually inspected and methods for detecting contraband ivory, such as risk assessment, profiling, targeting and sniffer dog techniques, are not routinely used. It is disappointing to note that, until very recently, almost none of the large-scale ivory

seizures resulted in successful investigations of the criminals behind these transactions. A number of recent high-profile cases in China, Tanzania and Uganda, however, have resulted in the arrests of suspects. Large-scale ivory seizures represent the most important ivory trade crime to solve.

*Trade routes*

The available information regarding the trade route of individual shipments that have been seized can vary considerably. In some cases only the country in which the seizure was made is known, in others the route from where the shipment was put together to its final destination is provided thus implicating several countries. It is important to understand that the absence of a particular trade route does not necessarily mean that there were no large-scale ivory movements along such a route, but rather that such trade was not detected by law enforcement agencies, or that a part of the trade route was not recorded in the data at hand. The appearance of new trade routes may be because law enforcement agencies have improved their ability to detect seizures along these routes. Unfortunately, it is not possible to produce bias-adjusted trade routes which would be required to provide a full interpretation. Nonetheless it is still useful to examine the trade routes inherent in the seizures data whilst recognising their limitations.

It appears that trade routes used for large movements of ivory have changed markedly since 2000. In the earlier part of the decade (Figure 12), there was considerable activity emanating from Atlantic Ocean seaports in Central and West Africa, particularly Douala, Cameroon, Lagos, Nigeria and Accra, Ghana, and from the Democratic Republic of the Congo to Belgium but by air. Movements of ivory within Africa involved a number of countries and trafficking between Sudan and Egypt, a major unregulated ivory market, was also noted. On Africa's east coast, Tanzania, Kenya and Mozambique also emerge in this period as exporters of ivory from the African continent. South Africa, however, is the most prominent country owing to one exceptional 7.1 tonne movement of ivory from Malawi through the port of Durban to Singapore, and then reportedly for onward shipment to Japan. Japan also seized ivory transiting from South Korea. Comparatively speaking, trade to China is modest at this time, however the final destination for about 40% of the seizures made during this period remain unknown. Interestingly, some of the ivory consignments going to China transited through Europe, probably owing to the fact that direct trade routes from Africa were less developed at the time.



*Figure 12. Trade routes for large-scale (>500kg) seizures of ivory, 2000 - 2008
(ETIS, 03 November 2013)*

*Note: The insert map of Asia is at a larger scale than the rest of the map; most trade from CG, CM, GH, KE, MZ, NG, TZ and ZA is by sea even if directional arrows cross landmasses.*

In the period 2009-2011 (Figure 13), there is a profound shift to the Indian Ocean ports of Dar es Salaam and Zanzibar in Tanzania, with most of the Tanzanian trade initially directed to Malaysia as the principal transit country, but some shipments also go to the Philippines, another transit country, whilst other consignments are sent directly to China. Trade out of Mombasa, Kenya develops during this period with multiple shipments transiting Malaysia, Viet Nam, Cambodia and the United Arab Emirates, whilst direct trade to end-use markets in Thailand and China is also noted. There is evidence of Cape Town, South Africa sending ivory to Malaysia too. Indeed, Malaysia is the paramount transit country and from there most ivory is redirected to Viet Nam or Hong Kong before reaching China. For the most part, shipments from West and Central Africa have greatly diminished, but East and Southern Africa countries are active in the trade through a variety of internal ivory movements. In terms of end-use markets, Japan drops out completely, but China becomes more important, with a lesser, secondary flow of ivory into Thailand, another end-use market. The cross-border trade between China and Viet Nam, in particular, surges during this period.



*Figure 13. Trade routes for large-scale (>500kg) seizures of ivory, 2009 - 2011 (ETIS, 03 November 2013)*
*Note: The insert map of Asia is at a larger scale than the rest of the map; most trade from KE, NG, TZ and ZA is by sea even if directional arrows cross landmasses.*



*Figure 14: Trade routes for large-scale (>500kg) seizures of ivory, 2012 - 2013 (ETIS, 03 November 2013)*

*Note: The insert map of Asia is at a larger scale than the rest of the map; most trade from CI, KE, MZ, NG, TG, TZ and ZA is by sea even if directional arrows cross landmasses.*

In the period 2012-2013 (Figure 14), Tanzania is still heavily involved in the trade, but Kenya's port of Mombasa becomes the leading conduit through which major flows of ivory exit Africa. Malaysia continues to be the major transit country in Asia, with the onward traffic going directly to China or, less so, to China via Viet Nam. But new transit players, Indonesia and Sri Lanka, emerge, possibly as alternatives to Malaysia. At the same time, trade though the Middle East, which started to develop in the period 2009-2011, grows further, with the United Arab Emirates featuring prominently. Hong Kong also functions as an important transit point for ivory to reach China, which is indisputably the major end-use destination. Within Africa, the criminal syndicates responsible for this illegal trade appear to be adapting with exploratory shifts to new countries like Togo and Côte d'Ivoire as exit points within Africa, and Spain and Turkey as transit countries to mask the fact that shipments originated in Africa. Various countries in East and Southern Africa are continuing to be very active in terms of internal ivory movements, and could reflect shifts in poaching patterns.

**List of contributors**

- Julian Blanc, CITES MIKE Programme
- Ken Burnham, Colorado State University
- Holly Dublin, IUCN/SSC African Elephant Specialist Group
- Tom Milliken, TRAFFIC International
- Peter Mwangi, IUCN/SSC African Elephant Specialist Group
- Louisa Sangalakula, TRAFFIC-International
- Diane Skinner, IUCN/SSC African Elephant Specialist Group
- Fiona Underwood, Independent Statistical Consultant

**References**

Blanc, J.J., Barnes, R.F.W., Craig, G. C., Dublin, H.T., Thouless, C.R., Douglas-Hamilton, I. and Hart, J.A. (2007). *African Elephant Status Report 2007: an update from the African Elephant Database*. Occasional Paper Series of the IUCN Species Survival Commission, No. 33. IUCN/SSC African Elephant Specialist Group. IUCN, Gland, Switzerland. vi + 276 pp.

Blanc, J. 2008. *Loxodonta africana*. In: IUCN 2013. IUCN Red List of Threatened Species. Version 2013.2. <www.iucnredlist.org>. Downloaded on 11 November 2013.

CITES (2011). SC61 Doc 44.2. *Status of the Elephant Populations, Levels of Illegal Killing and the Trade in Ivory: Report to the Standing Committee of CITES*. Annex 1. Sixty-first meeting of the Standing Committee. Geneva, Switzerland, 15-19 August 2011.

CITES (2012). SC62 Doc 46.1. *Elephant conservation, illegal killing and ivory trade*: *Report to the Standing Committee of CITES.* Sixty-second meeting of the Standing Committee. Geneva, Switzerland, 23-27 July 2012.

UNEP, CITES, IUCN, TRAFFIC (2013). *Elephants in the Dust – The African Elephant Crisis.* A Rapid Response Assessment. United Nations Environment Programme, GRID-Arendal.

Maisels F, Strindberg S, Blake S, Wittemyer G, Hart J, et al. (2013) Devastating Decline of Forest Elephants in Central Africa. *PLoS ONE* 8(3): e59469. doi:10.1371/journal.pone.0059469

Milliken, T., Burn, R.W., Underwood, F.M. and Sangalakula, L. (2012). *The Elephant Trade Information System (ETIS) and the Illicit Trade in Ivory: a report to the 16th meeting of the Conference of the Parties*. CoP16 Doc. 53.2.2 (Rev. 1), CITES Secretariat, Geneva, Switzerland. 30 pp.

Underwood, F.M., Burn, R.W., Milliken, T. (2013). Dissecting the Illegal Ivory Trade: An Analysis of Ivory Seizures Data. *PLoS ONE* 8 (10): e76539.

# Attachment C

ADVERTISEMENT

SCIENTIFIC AMERICAN™

Permanent Address: http://www.scientificamerican.com/article/the-science-is-in-elephants-are-even-smarter-than-we-realized-video/

Evolution » News

# The Science Is In: Elephants Are Even Smarter Than We Realized [Video]

We now have solid evidence that elephants are some of the most intelligent, social and empathic animals around—so how can we justify keeping them in captivity?

February 26, 2014 | By Ferris Jabr |

One day in 2010, while taking a stroll in his backyard, Kandula the elephant smelled something scrumptious. The scent pulled his attention skyward. There, seemingly suspended in the air, was a sprig of bamboo decorated with bits of cantaloupe and honeydew. Stretching out his trunk, he managed to get the fruit and break off a piece of the branch, but the rest of the tasty leaves remained tantalizingly out of reach. Without hesitation he marched straight to a large plastic cube in the yard, rolled it just beneath the hovering bamboo and used it as a step stool to pull the whole branch to the ground. Seven-year-old Kandula had never before interacted with a cube in this manner. Determined to satisfy his stomach and his curiosity, he did something scientists did not know elephants could do: he had an aha moment.

Elephants walking in line in Amboseli national park, south Kenya.
*Credit: blieusong/Flickr*

ADVERTISEMENT

A couple weeks earlier a team of researchers led by Diana Reiss and Preston Foerder, then at City University New York, had visited Kandula's home at the National Zoo in Washington D.C. They placed sticks and sturdy cubes around the yard and strung a kind of pulley system similar to a laundry line between the roof of the elephant house and a tree. From the cable they dangled fruit-tipped bamboo branches of various lengths both within and without of Kandula's reach. After preparing the aerial snacks they retreated out of sight, turned on a camera and waited to see what the young elephant would do. It took several days for Kandula to achieve his initial insight, but after that he repeatedly positioned and stood on the cube to wrap his trunk around food wherever the scientists suspended it; he learned to do the same with a tractor tire; and he even figured out how to stack giant butcher blocks to extend his reach.



Other elephants had failed similar tests in the past. As it turns out, however, those earlier studies were not so much a failure of the elephant mind as the human one. Unlike people and chimpanzees, elephants rely far more on their exquisite senses of smell and touch than on their relatively poor vision, especially when it comes to food. Previously, researchers had offered elephants only sticks as potential tools to reach dangling or distant treats—a strategy at which chimps excel. But picking up a stick blunts an elephant's sense of smell and prevents the animal from feeling and manipulating the desired morsel with the tip of its dexterous trunk. Asking an elephant to reach for a piece of food with a stick is like asking a blindfolded man to locate and open a door with his ear. "We are always looking at animals through our human lens—it's hard not to," Reiss says. "But now we have an increased appreciation of diverse thinking creatures all around us because of so much research on so many species. It's fascinating to try and find ways of testing animal minds so they can show us what they are really capable of."

People have been telling legends of elephant memory and intelligence for thousands of years and scientists have carefully catalogued astounding examples of elephant cleverness in the wild for many decades. In the past 10 years, however, researchers have realized that elephants are even smarter than they thought. As few as eight years ago there were almost no carefully controlled experiments showing that elephants could match chimpanzees and other brainiacs of the animal kingdom in tool use, self-awareness and tests of problem-solving. Because of recent experiments designed with the elephant's perspective in mind, scientists now have solid evidence that elephants are just as brilliant as they are big: They are adept tool users and cooperative problem solvers; they are highly empathic, comforting one another when upset; and they probably do have a sense of self.

Despite the sharpened awareness of elephant sentience, many zoos around the world continue to maintain or expand their elephant exhibits and increasing numbers of heavily armed poachers are descending on Africa to meet the soaring demand for ivory, killing as many as 35,000 elephants a year. The U.S. recently banned ivory trade, with some exceptions, but there have been no steps toward outlawing elephant captivity. At least a few zoos are using the latest science to transform their elephant enclosures, giving the animals more room to roam as well as intellectually stimulating puzzles. Only some zoos can afford to make such changes, however, and many elephant experts maintain that, given everything we know about the creatures' mental lives, continuing to keep any of them locked up is inexcusable.

**Mental mettle**

The modern elephant mind emerged from an evolutionary history that has much in common with our own. The African bush and forest elephants, the Asian elephant, and their extinct relatives, the mammoths, all began to assume their recognizable forms between three and five million years ago in Africa. As Louis Irwin of The University of Texas at El Paso explains, both humans and elephants adapted themselves to life in Africa's forests and savannas around the same time, emigrating to Europe and Asia; both evolved to live long and often migratory lives in highly complex societies; both developed intricate systems of communication; and both experienced a dramatic increase in brain size.

Over the years numerous observations of wild elephants suggested that the big-brained beasts were some of the most intelligent animals on the planet. They remembered the locations of water holes hundreds of kilometers apart, returning to them year after year. They fashioned twigs into switches to shoo flies and plugged drinking holes with chewed up balls of bark. They clearly formed strong social

bonds and even seemed to mourn their dead (see "When Animals Mourn" in the July 2013 issue of *Scientific American*). Yet scientists rarely investigated this ostensibly immense intellect in carefully managed experiments. Instead, researchers looking for evidence of exceptional mental aptitude in nonhuman animals first turned to chimpanzees and, later, to brainy birds like ravens, crows and some parrots. Only in the past 10 years have scientists rigorously tested elephant cognition. Again and again these new studies have corroborated what zoologists inferred from behavior in the wild.

Scientists living among herds of wild elephants have long observed awe-inspiring cooperation between family members. Related elephant mothers and their children stay together throughout life in tight-knit clans, caring for one another's children and forming protective circles around calves when threatened by lions or poachers. Elephant clan members talk to one another with a combination of gentle chirps, thunderous trumpets and low-frequency rumbles undetectable to humans, as well as nudges, kicks and visual signals such as a tilt of the head or flap of the ear. They deliberate among themselves, make group decisions and applaud their achievements. "Being part of an elephant family is all about unity and working together for the greater good," says Joyce Poole, one of the world's foremost elephant experts and co-founder of the charity ElephantVoices, which promotes the study and ethical care of elephants. "When they are getting ready to do a group charge, for example, they all look to one another: 'Are we all together? Are we ready to do this?' When they succeed, they have an enormous celebration, trumpeting, rumbling, lifting their heads high, clanking tusks together, intertwining their trunks."

Cynthia Moss, director of the Amboseli Trust for Elephants and another preeminent elephant researcher, once saw a particularly amazing example of elephant cooperation. One day the young and audacious Ebony, daughter of a matriarch named Echo, bounded right into the midst of a clan that was not her own. As a show of dominance, that clan kidnapped Ebony, keeping her captive with their trunks and legs. After failing to retrieve Ebony on their own, Echo and her eldest daughters retreated. A few minutes later they returned with all the members of their extended family, charged into the clan of kidnappers and rescued Ebony. "That took forethought, teamwork and problem-solving," Moss says. "How did Echo convey that she needed them? It's a mystery to me, but it happened."

In 2010 Joshua Plotnik of Mahidol University in Thailand and his colleagues tested elephant cooperation in a controlled study for the first time. At a Thai conservation center, they divided an outdoor elephant enclosure into two regions with a volleyball net. On one side stood pairs of Asian elephants. On the other side the researchers attached two bowls of corn to a table that slid back and forth on a frame of plastic pipes. They looped a hemp rope around the table so that when both ends of the rope were pulled simultaneously the table moved toward the elephants, pushing the food underneath the net. If a single elephant tried to pull the rope by him or herself, it would slip out and ruin any chance of getting the food. All the elephants quickly learned to cooperate and even to patiently wait for a partner if the scientists prevented both animals from reaching the rope at the same time. One mischievous young elephant outsmarted the rest. Instead of going through the hassle of tugging on one end of the rope, she simply stood on it and let her partner do all the hard work.



Some scientists studying wild elephants have argued that, in addition to cooperating for survival's sake, the creatures are capable of genuine empathy. Poole recalls, for example, one elephant flinching as another stretched her trunk towards an electric fence; it was fortunately inactive at the time but had been live in the past. Elephants often refuse to leave their sick and injured behind, even if the

ailing animal is not a direct relative. Poole once observed three young male elephants struggle to revive a dying matriarch, lifting her body with their tusks to get her back on her feet. Another time, while driving through Kenya's Amboseli National Park, Poole saw a female elephant give birth to a stillborn baby. The mother guarded her dead calf for two days, trying over and over to revive its limp body. Realizing that the grieving mom had not had any sustenance this whole time, Poole drove near her with an offering of water. The elephant stretched her trunk inside the car and eagerly drank her fill. When she was done, she remained with Poole for a few moments, gently touching her chest.

When elephants encounter an elephant skeleton, they slow down, approach it cautiously, and caress the bones with their trunk and the bottoms of their sensitive padded feet. Elephants do not show the same interest in the remains of other species. In one experiment elephants spent twice as much time investigating an elephant skull as those of either a rhinoceros and buffalo and six times longer probing ivory than a piece of wood. Moss has witnessed elephants kicking dirt over skeletons and covering them with palm fronds.

Plotnik and renowned animal behavior expert Frans de Waal of Emory University recently teamed up to study elephant empathy. On a monthly basis between the spring of 2008 and 2009 they observed 26 Asian elephants at the Elephant Nature Park in Thailand, looking for signs of what researchers call "consolation." Many animals are capable "reconciliation"—making up after a tussle. Far fewer animals display true consolation: when a bystander goes out of his or her way to comfort the victim of a fight or an individual that is disturbed for some reason. On dozens of occasions Plotnik and de Waal saw elephants consoling one another. A perturbed elephant often perks up its ears and tail and squeals, roars or trumpets. Over the course of the study, many elephants behaved in this way, because of an altercation, because they were spooked by something—such as a helicopter or dog—or for an unknown cause. When other elephants recognized these signs of anxiety, they rushed to the upset animal's side, chirping softly and stroking their fellow elephant's head and genitals. Sometimes the elephants put their trunks in one another's mouths—a sign of trust because doing so risks being bitten.

The aspect of elephant intelligence that is the trickiest to gauge—the one that has really challenged scientists to think like an elephant—is self-awareness. Scientists now have preliminary evidence that elephants are indeed self-aware, overturning previous findings. To determine whether an animal has a sense of self, researchers first place a mark on an animal's body that it can identify only with the help of a mirror. Then they wait to see if the animal tries to get rid of the mark when it encounters its reflection. Doing so, the reasoning goes, means the animal understands when it is looking at itself rather than another animal. In the earliest studies on elephant self-awareness, researchers placed a one by 2.5–meter mirror outside the bars of an enclosure, angled in such a way that the animals could see only the upper thirds of their bodies. The elephants reacted to the reflection as they would to another elephant, raising their trunks in greeting. When the scientists dabbed the elephants' faces with white cream, the animals failed to recognize that the marks were on their own bodies.

But what if the experimental design itself prevented the elephants from understanding that they were looking at themselves in the mirror? After all, elephants identify one another primarily by touch, scent and sound—not sight—and the animals in the study could not physically investigate the mirror. So Reiss, de Waal and Plotnik decided to redo these experiments, this time allowing the elephants to use all their senses.

In 2005 the trio constructed a 2.5 by 2.5–meter shatterproof mirror and bolted it to a wall surrounding an elephant yard at the Bronx Zoo in New York City. Three female Asian elephants named Patty, Maxine and Happy were free to approach and inspect the sturdy mirror at their leisure. When they first encountered the contraption, Maxine and Patty swung their trunks over it and attempted to scale the wall to which it was attached, as though checking to see whether another elephant was hiding behind the glass. When they found nothing, all three elephants swayed their trunks and bobbed their heads while looking right into the mirror, just as we might wave our hands to see whether a shadow is our own. They stared at their reflection and stuck their trunks inside their mouths as though searching for snagged spinach.

A few days later the scientists painted a white X onto the right side of each elephant's face. Maxine and Patty did not seem to notice the marks, but Happy began to touch the X on her face with her trunk after strolling past the mirror a few times. Eventually she faced her reflection and repeatedly swiped at the painted part of her face with the tip of her trunk.

The fact that only one of three elephants noticed the X on its face might seem a disappointing performance, but it is actually quite remarkable. Reiss points out that even in studies with chimpanzees—which most researchers accept are self-aware—sometimes fewer than half pass the mirror test. Plotnik argues that expecting elephants to pay attention to a random blotch on their face may not have

been the best test of their self-awareness anyhow. Whereas chimpanzees are fastidious groomers that spend hours picking nits and gnats out of one another's hair, elephants stay clean by getting dirty, routinely spraying themselves with dust and dirt to deter insects and parasites. And they love to galumph in mud. "There's no reason to think elephants would have same kind of vanity," Plotnik says.

**Brains behind bars**

All the new evidence of elephant intelligence has intensified the debate about whether to continue keeping the creatures in captivity. Former elephant caretaker Dan Koehl maintains a thorough database of elephants around the world. He has records of 7,828 elephants currently in captivity: 1,654 in zoos or safari parks; 4,549 in "elephant camps" where tourists can ride the animals; 288 in circuses; and the remaining in temples, sanctuaries or private residences. The latest research on the well-being of U.S. zoo elephants is not particularly encouraging. With mny collaborators, animal welfare expert and Vistalogic, Inc., consultant Cheryl Meehan recently completed a gint study on nearly all of the 300 or so elephants in North American zoos accredited by the Association of Zoos and Aquariums (AZA). The researchers assessed the physical and mental health of captive elephants with a combination of photographs, videos, blood and hormone tests, veterinary reports, and surveys filled out by caretakers: about 75 percent of the elephants were overweight or obese; between 25 and 40 percent had foot or joint problems of some kind depending on the year; and 80 percent displayed behavioral tics, such as pacing and continual head bobbing or swaying.

Stephen Harris of the University of Bristol and his colleagues conducted a similar study on U.K. zoo elephants in the late 2000s. I asked him whether it is possible to keep an elephant physically and mentally healthy in a zoo. His answer was succinct: "No." The elephants he studied spent up to 83 percent of their time indoors, often in cramped conditions; the majority had abnormal gaits; 75 percent were overweight; more than 50 percent had behavioral tics; and one individual displayed tics for 14 hours in a single day. Captive elephants also have higher rates of infertility and die younger on average than their uncaged counterparts. Whereas wild elephants migrate great distances through the forest or savanna in search of food and water—eating huge amounts of tough, fibrous grasses and shrubs that are difficult to digest—zoo elephants spend too many hours standing idle on concrete and consume calorie-rich foods they would rarely encounter in their native habitat. Researchers have also learned that many zoo elephants do not get the rest they need because they do not like to lie down and sleep on stone or other hard surfaces.

Few zoos can adequately re-create the complex social life of wild elephants. Female elephants in captivity are often strangers acquired from here and there. Any friendships that do form can dissolve in an instant when a zoo decides to relocate an animal. "Sometimes people treat these creatures like furniture," Moss says. Researchers used to think that male elephants, which leave their clans in young adulthood, were loners. They now know, however, that male elephants socialize extensively with one another. Yet zoos mix males and females in ways that would never occur in the wild and try to offload adult males if they become too cantankerous or lustful.

Now that the evidence of the elephant's intellect and emotional life is no longer mostly anecdotal the zoological community faces even more pressure to answer a daunting question: Why keep elephants in captivity at all? Zoos usually give two main reasons: to rescue elephants from dire situations, such as the threat of poachers or the stress of living in so-called rehabilitation centers in Asia that keep the creatures leashed to trees; and to teach the public how amazing elephants are, in hopes of promoting their conservation.

These arguments have become increasingly tenuous over time. Few elephants in zoos today were rescued from an awful life; instead they were born in captivity. In the mid-2000s zoos embarked on an especially aggressive captive elephant breeding program, trying to compensate for all the animals they had lost to disease and frailty. "For every elephant born in a zoo, on average another two die," concluded a comprehensive 2012 investigative report by *The Seattle Times*. As for educational outreach, modern technology has rendered zoos obsolete. "When I was a kid we had no television and even when we did wildlife images were very few," Harris says. "You went to the zoo to interact with elephants, to ride on them and touch them—there was no other way to get a sense of them. Now of course there's an information overload. You can get a sense of scale and see all kinds of wonderful behaviors from photography and films that you would never see in captivity." Consider how much one can learn from vivid scenes of wild elephants in a nature documentary of *Planet Earth* caliber compared with the experience of staring at an arthritic bobble-headed zoo elephant.

Other scientists think that, even if there are few good reasons to keep elephants in zoos in the first place, arguing for an abrupt end to elephant captivity is naive and idealistic, especially outside North America and Europe. "Although I believe all elephants should be wild, unfortunately that is not realistic," Plotnik says. In Asia, where he works, people have been using elephants as beasts of burden for centuries and currently have thousands of the animals captive in camps. Suddenly releasing all those animals is simply not feasible; there may not even be enough wild habitat left to accommodate them all. Plotnik thinks the best way forward is maintaining the wild

Asian elephant population through conservation and slowly phasing out the captive one by finding new, equally lucrative jobs for elephant caretakers. Moss wants something similar for elephants in zoos in the U.S. and Europe: “I would like to see them live out their lives and have no more breeding or importation.” Meehan hopes the kind of information she has collected will help improve the well-being of zoo elephants.

In recent years at least a few zoos have been trying to use animal welfare science to make their elephant enclosures more like sanctuaries. The Oregon Zoo in Portland is close to remodeling its elephant habitat in a way it claims will improve the livelihood of its four male and four female Asian elephants. Elephant Lands, set to open in 2015, is a hilly 2.5-hectare habitat covered mostly in deep sand rather than concrete and featuring a 490,000-liter pool for wallowing, bathing and playing. Elephants will be free to roam from one part of the terrain to another, explains elephant curator Bob Lee, which should hopefully allow males and females to interact as they choose. Various feeding machines will provide elephants with food at random intervals, because studies have linked such unpredictability to healthier body weights. Other feeders will exercise the elephants’ trunks and brains with out-of-reach snacks and mechanical puzzles.

Refurbishing elephant enclosures so they are roomier and more intellectually stimulating is at once an acknowledgment and dismissal of the research on elephant intelligence and welfare. After all, if the zoos really have the animals’ best interests at heart, they would close their elephant exhibits. In 2005 the Detroit Zoo became the first to give up its elephants solely on ethical grounds. Spending so much time in close quarters—and waiting out the harsh Michigan winters indoors—left their two Asian elephants physically and mentally ill. Wanda and Winky were moved to the Performing Animal Welfare Society's (PAWS) 930-hectare sanctuary in San Andreas, Calif. A handful of zoos have followed suit, but they are in the minority.

Ed Stewart, president and co-founder of PAWS, thinks that even his massive haven is not adequate to keep the elephants as healthy as they would be in the wild. "Elephants should not be in captivity— period," he says. "It doesn’t matter if it’s a zoo, a circus or a sanctuary. The social structure isn't correct, the space is not right, the climate is not right, the food is not right. You can never do enough to match the wild. They are unbelievably intelligent. With all of that brainpower—to be at all. In 20 years I hope we will look back and think, 'Can you believe we ever

*Next Article*

***Malaysia, Singapore Grapple with Prolonged Dry Spell***

*Read More »*

SCIENTIFIC AMERICAN
SPACE
FREE GIFT
Give a Gift &
Get a Gift - Free!
Give a 1 year subscription as low as $14.99
Subscribe Now! >

ntific American is a trademark of Scientific American, Inc., used with permission

015 Scientific American, a Division of Nature America, Inc.

Rights Reserved.

# Attachment D



# NATIONAL STRATEGY FOR COMBATING WILDLIFE TRAFFICKING

FEBRUARY 2014





THE WHITE HOUSE

WASHINGTON

February 11, 2014

Like other forms of illicit trade, wildlife trafficking undermines security across nations. Well-armed, well-equipped, and well-organized networks of criminals and corrupt officials exploit porous borders and weak institutions to profit from trading in poached wildlife. Record high demand for wildlife products, coupled with inadequate preventative measures and weak institutions has resulted in an explosion of illicit trade in wildlife in recent years.

That trade is decimating iconic animal populations. Today, because of the actions of poachers, species like elephants and rhinoceroses face the risk of significant decline or even extinction. But it does not have to be that way. We can take action to stop these illicit networks and ensure that our children have the chance to grow up in a world with and experience for themselves the wildlife we know and love.

Addressing these challenges requires a U.S. strategy that is proactive, recognizes immediate imperatives, and balances our strengths and expertise to address challenges comprehensively over the long term. This is a global challenge requiring global solutions. So we will work with foreign governments, international organizations, nongovernmental organizations, and the private sector to maximize our impacts together. Our efforts will aim to strengthen enforcement, reduce demand, and increase cooperation to address these challenges.

The entire world has a stake in protecting the world's iconic animals, and the United States is strongly committed to meeting its obligation to help preserve the Earth's natural beauty for future generations.



# National Strategy for Combating Wildlife Trafficking

## Executive Summary

The *National Strategy for Combating Wildlife Trafficking* establishes guiding principles and strategic priorities for U.S. efforts to stem illegal trade in wildlife. This *Strategy* positions the United States to exercise leadership in addressing a serious and urgent conservation and global security threat. It calls for strengthening the enforcement of laws and international agreements that protect wildlife while reducing demand for illegal wildlife and wildlife products. It affirms our Nation's resolve to work in partnership with governments, local communities, nongovernmental organizations, the private sector, and others to strengthen commitment to combating wildlife trafficking.

The United States will advance three strategic priorities to combat wildlife trafficking.

1. **Strengthen Enforcement—**We will improve efforts in the United States to stop illegal trade in wildlife and to enforce laws prohibiting wildlife trafficking. We will use administrative tools to address the dramatic increase in illegal elephant ivory and rhino horn trade. We will improve coordination and prioritize wildlife trafficking across enforcement, regulatory, and intelligence agencies. We will integrate wildlife trafficking, where appropriate, with other U.S. efforts to combat transnational organized crime. We will also help improve global enforcement efforts by supporting partner countries to build enforcement capacity. We will provide assistance for field-level wildlife and protected area management and enforcement, and also assist and participate in multinational enforcement operations targeting illegal trade in wildlife. We will work to dismantle trafficking networks and prevent others from assuming their illegal activities.

2. **Reduce Demand for Illegally Traded Wildlife—**We will raise public awareness of the harms done by wildlife trafficking through outreach in the United States and public diplomacy abroad to dissuade consumers from purchasing illegally traded wildlife. Criminals will continue to kill wildlife and traffic in contraband as long as the potential profits remain so high. We must enlist individual consumers in our country and other nations in this fight by educating them about the impacts of wildlife trafficking, on people as well as wildlife, and encouraging them to examine their purchasing patterns.

3. **Expand International Cooperation and Commitment—**Through our diplomacy, we will mobilize global support for, and encourage partners to actively participate in, the fight against wildlife trafficking. We will strengthen implementation of international agreements and arrangements that protect wildlife. We will build partnerships with governments, intergovernmental organizations, nongovernmental organizations, local communities, and the private sector to address this issue to develop and implement innovative and effective approaches to combating wildlife trafficking.

Advancing these strategic priorities will require a whole-of-government approach that marshals and strategically applies Federal resources. It demands innovative and science-based analytical tools and inclusive information sharing. And, it requires strengthening relationships and partnership to develop and implement strategies for dealing with all aspects of wildlife trafficking. Now is the time for effective solutions to combat wildlife trafficking.



# Introduction

In the past decade, wildlife trafficking—the poaching or other taking of protected or managed species and the illegal trade in wildlife and their related parts and products—has escalated into an international crisis. Wildlife trafficking is both a critical conservation concern and a threat to global security with significant effects on the national interests of the United States and the interests of our partners around the world.

As President Obama said in Tanzania in July 2013, on issuing a new Executive Order to better organize United States Government efforts in the fight against wildlife trafficking, wildlife is inseparable from the identity and prosperity of the world as we know it. We need to act now to reverse the effects of wildlife trafficking on animal populations before we lose the opportunity to prevent the extinction of iconic animals like elephants and rhinoceroses. Like other forms of illicit trade, wildlife trafficking undermines security across nations. Well-armed networks of poachers, criminals, and corrupt officials exploit porous borders and weak institutions to profit from trading in illegally taken wildlife.

We know that the United States is among the world's major markets for wildlife and wildlife products, both legal and illegal. In Asia, increased demand for ivory and rhino horn stems from a rapidly expanding wealthy class that views these commodities as luxury goods that enhance social status. As a result, we have seen an increase in ready buyers within Africa who serve as dealers to clients in Asia. Increased demand for elephant ivory and rhino horn has triggered dramatic and rapid upticks in poaching in Africa. Criminal elements of all kinds, including some terrorist entities and rogue security personnel—often in collusion with government officials in source countries—are involved in poaching and transporting ivory and rhino horn across Africa. We assess with high confidence that traffickers use sophisticated networks and take advantage of jurisdictions where public officials are complicit in order to move elephant ivory and rhino horn from remote areas to markets and ports, perpetuating corruption and border insecurity, particularly in key eastern, central, and southern African states. Some of these networks are likely the same or overlap with those that also deal in other illicit goods such as drugs and weapons.

Poaching presents significant security challenges for militaries and police forces in African nations, which are often outgunned by poachers and their criminal and extremist allies. Moreover, wildlife trafficking corrodes democratic institutions and undermines transparency. Corruption and lack of sufficient penal and financial deterrents are hampering these governments' abilities to reduce poaching and trafficking. Material and training, legal, and diplomatic support could have a significant impact on the trajectory of the illicit rhino horn and ivory trades, and would also represent a relatively cost-effective way to gain new insights into the behavior of implicated criminal groups and associated trafficking networks. However, the widespread complicity of military and government officials in the trade hinders potential partnerships.



# Why Now?

The scale and scope of wildlife trafficking continue to grow at an alarming rate, reversing decades of conservation gains. Wildlife trafficking threatens an increasing variety of terrestrial, freshwater, and marine species, including but not limited to: elephants, rhinos, tigers, sharks, tuna, sea turtles, land tortoises, great apes, exotic birds, pangolins, sturgeon, coral, iguanas, chameleons, and tarantulas. Wildlife trafficking is facilitated and exacerbated by illegal harvest and trade in plants and trees, which destroys needed habitat and opens access to previously remote populations of highly endangered wildlife, such as tigers. In addition, illegal trafficking of fisheries products, among others, threatens food supplies and food security. Many species decimated by illegal trade and other threats, such as habitat loss, are now in danger of extinction. Wildlife trafficking jeopardizes the survival of iconic species such as elephants and rhinos. Now is the time for greater action, before such losses become irreversible.

The United States has long placed great value and importance on conserving wildlife resources within and beyond our borders. Federal law has protected some of this Nation's species from poaching and illegal commercialization for more than a century. As the first Nation to ratify the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) in 1974, the United States has consistently stood with countries around the world in combating wildlife trafficking and protecting natural resources.

Conservation efforts to protect biodiversity and preserve functioning ecosystems are critical to secure economic prosperity, regional stability, and human health around the world. Wildlife trafficking now threatens not only national and global wildlife resources but also national and global security. This reality requires that we strengthen our efforts at home and abroad and ensure that the agencies tasked with this work have adequate resources, appropriate authorities, and the necessary partnerships to do it well.

This strategy sets forth a broad and time-sensitive course of action. This crisis must be addressed aggressively and quickly, or it will be too late.



# U.S. Strategic Priorities

We have identified three strategic priorities to respond to the global wildlife trafficking crisis and address related threats to U.S. national interests:

1. Strengthen enforcement;

2. Reduce demand for illegally traded wildlife; and

3. Build international cooperation, commitment, and public-private partnerships.

To meet these strategic goals, we will expand United States Government leadership guided by the following principles.

- **Marshal Federal Resources for Combating Wildlife Trafficking** by elevating this issue as a core missions of all relevant executive branch agencies and departments and ensuring effective coordination across our government.

- **Use Resources Strategically** by identifying common priorities and strategic approaches and by coordinating and harmonizing funding and programs across agencies to maximize strategic impact and minimize duplication of efforts.

- **Improve the Quality of Available Information** by developing and using innovative and science-based tools to gather and appropriately share the information needed to fight wildlife trafficking and to assess and improve our and our partners' efforts.

- **Consider All Links of the Illegal Trade Chain** in developing and evaluating strategies to establish strong and effective long-term solutions that address all aspects of wildlife trafficking, from poaching and transit through consumer use.

- **Strengthen Relationships and Partnerships** with the many public and private partners who share our commitment and our belief that continued coordination among nations, as well as with nongovernmental organizations and the private sector, are key to stopping wildlife trafficking.



# I. Strengthen Enforcement

To fight wildlife trafficking, all countries must have the investigative, enforcement, and judicial capabilities to respond to these crimes and disrupt wildlife trafficking networks.

## U.S. Domestic Enforcement

Wildlife trafficking occurs across and within our borders. The United States is among the world's major markets for wildlife and wildlife products, both legal and illegal. Our country also serves as a transit point for trafficked wildlife moving from range (or source) countries to other markets around the globe and as a source for illegally taken wildlife entering the global trade. We will treat wildlife trafficking as the serious crime it is and work to ensure that our enforcement efforts adequately protect wildlife resources. To accomplish this goal, the United States Government will:

- **Assess and Strengthen Legal Authorities—**We will analyze and assess the laws, regulations, and enforcement tools that the United States can use against wildlife trafficking to determine which are most effective and which need strengthening to better deter wildlife trafficking and foster successful investigation and prosecution of wildlife traffickers. We will work with the Congress to seek legislation that recognizes wildlife trafficking crimes as predicate offenses for money laundering, thus placing wildlife trafficking on an equal footing with other serious crimes.
- **Use Administrative Tools to Quickly Address Current Poaching Crisis—**We propose to immediately pursue a series of administrative actions to establish a U.S. ban with limited exceptions on elephant ivory and rhino horn trade in response to unparalleled and escalating threats to these species. We will strengthen controls on the commercial import of African elephant ivory by eliminating broad administrative exceptions to the 1989 African Elephant Conservation Act moratorium. We will ensure that African elephants receive the same protections as other threatened or endangered species by revoking the regulatory exemption that allows African elephant ivory to be traded in ways that would otherwise be prohibited by the Endangered Species Act. We will limit the number of elephant sport-hunting trophies that an individual can import, adopting the same rule that now exists for leopard trophies. We will improve the protections that the Endangered Species Act provides for all species listed as threatened or endangered by clarifying the regulations that implement the statute's exemptions for commercial trade of 100-year old antiques. We will also improve our ability to protect elephants, rhinos, and other CITES-listed wildlife by finalizing a proposed rule that will reaffirm and improve public understanding of the "use after import" provisions in U.S. CITES regulations, which strictly limit sales, including intrastate sales, of wildlife that was imported for noncommercial purposes.
- **Strengthen Interdiction and Investigative Efforts—**We will enhance efforts to curb the illegal flow of wildlife products across and within U.S. borders. We will strengthen Federal wildlife import/export regulations as needed and optimize the wildlife inspection presence at U.S. ports of entry. We will target wildlife trafficking and distribution networks within the United States by conducting criminal investigations, identifying weak international trade controls, and disrupting illicit finance tied to wildlife traffickers. We will pursue prosecutions in the United States to remove key leaders and operatives and to break up syndicates.

- **Prioritize Wildlife Trafficking Across U.S. Enforcement Agencies**—We will work to improve interagency cooperation to detect, interdict, and investigate wildlife trafficking. We will assess ways to augment the law enforcement capacities of the U.S. Fish and Wildlife Service and the National Oceanic and Atmospheric Administration with other law enforcement agencies. Recognizing that state and tribal law protects many key species that are subject to illegal exploitation, we will strengthen and sustain Federal partnerships with states, local and territorial governments, and tribes to protect domestic resources from poaching and illegal trade.
- **Enhance Coordination Among and Between Enforcement and Intelligence Agencies**—We will assess ways to increase coordination among law enforcement and intelligence agencies to enhance the effectiveness of Federal efforts to combat wildlife trafficking. For example, we will seek to establish and institutionalize appropriate pathways for conveying intelligence gathered on transnational organizations involved in wildlife trafficking to the enforcement agencies charged with investigating such crimes.
- **Take the Profit Out of Wildlife Trafficking**—We must target the assets of wildlife trafficking networks to make wildlife trafficking less profitable. We will seize the financial gains of wildlife traffickers in prosecutions, using all appropriate tools: fines and penalties, both criminal and civil, forfeiture of assets and instrumentalities, and restitution for those victimized by wildlife crimes. Where possible, we will ensure that funds generated through prosecutions are directed back to conservation efforts or to combating wildlife trafficking. We will work with the Congress to provide language to allow for investing funds generated through wildlife trafficking prosecutions into conservation efforts or to combating wildlife trafficking, as well as to ensure adequate authority to forfeit all proceeds of wildlife trafficking and to assess whether current fine and penalty provisions provide adequate deterrence.

## Global Enforcement

We will continue to help range, transit, and consumer countries identify gaps and build capacity for investigating and prosecuting wildlife trafficking. We will also continue to work directly with other countries to pursue and to provide operational support for multinational wildlife trafficking enforcement operations. To accomplish this goal, the United States Government will:

- **Support Governments in Building Capacity**—We will continue to collaborate with foreign government partners in building their capacity to stop poaching and illegal wildlife trade and to develop and effectively enforce wildlife trafficking laws. These efforts will focus on building the capacity to fight wildlife trafficking at all critical stages of enforcement: crafting strong laws, stopping poachers, protecting borders, investigating traffickers, fighting trafficking-related corruption, improving professionalism, strengthening judicial and prosecutorial effectiveness, building and bringing strong cases, and obtaining penalties adequate to deter others.
- **Support Community-Based Wildlife Conservation**—We will support efforts to work with local communities to protect wildlife and prevent wildlife trafficking. Local communities are essential partners on the ground and can be a powerful force in support of wildlife conservation and a frontline defense against poaching. We will support efforts to help create alternative livelihoods to poaching (when applicable) and encourage local community members to participate directly

in wildlife protection activities, including intelligence networks and developing channels for the public to report crimes.

- **Support Development and Use of Effective Technologies and Analytical Tools—**We will emphasize the importance of developing and disseminating cost-effective and accurate tools to support wildlife trafficking investigations and prosecutions, including technology that can be used to develop admissible evidence on species' identity and the geographic origin of wildlife parts and products. We will support analytic tools and technological solutions that can assist with identifying poaching hotspots or addressing the wildlife trafficking supply chain. We will also seek to further develop law enforcement tools and techniques to address cyber activities related to the selling and purchasing of illegal wildlife products on the Internet.
- **Enhance Information Sharing—**We will seek to ensure that intelligence activities are appropriately integrated in our international enforcement efforts. We will share information, as appropriate, on transnational criminal organizations, terrorist entities and rogue security personnel and the corrupt officials, individuals, and entities that facilitate these enterprises. Consistent with established priorities and resources, we will focus on financial networks linking source, transit, and demand countries, particularly those networks that pose the greatest threat to U.S. national security interests. We will also work with our partner countries by helping them build their capacity to collect and analyze information, particularly for intelligence, forensic, investigative, and prosecutorial purposes.
- **Participate in Multinational Enforcement Operations—**We will build on the enforcement success that the United States has had in working with the international community by increasing the advice and assistance we provide for multinational wildlife trafficking enforcement operations and by supporting and engaging in joint operations with enforcement authorities of other nations or multinational and intergovernmental bodies.
- **Seek to Develop an Effective Worldwide Wildlife Enforcement Networks (WENS)—**We will continue to support regional WENs and encourage greater cooperation between the WENs that are already operating in a number of regions. We will support the development of additional regional WENs where appropriate, with the ultimate objective of developing a strong and effective worldwide network of WENs.
- **Address Wildlife Trafficking in Fighting Other Transnational Organized Crime—**We will increase coordination among the agencies that lead our efforts to combat wildlife trafficking and those that lead our efforts to stop transnational organized crime so that wildlife trafficking issues are addressed, as appropriate, through the implementation of the *Strategy to Combat Transnational Organized Crime* (July 19, 2011).
- **Focus on Corruption and Illicit Financial Flows—**We will increase our efforts with our partner countries to target the corrupt public officials who make wildlife trafficking possible by linking technical assistance with anticorruption cooperation and efforts. We will coordinate with international partners to target the assets and impede the financial efforts of wildlife traffickers. We will also work to identify corrupt foreign officials, entities, or individuals who work with wildlife traffickers, and target their assets for forfeiture and repatriation to affected governments as appropriate.



# II. Reduce Demand for Illegally Traded Wildlife

Increasing antipoaching and antitrafficking enforcement efforts will have only limited effect unless we work simultaneously to address the persistent market demand that drives this trade.

Criminals will continue to kill wildlife and traffic in contraband as long as the potential profits outweigh the risks. We must enlist individual consumers in our country and other nations in this fight by educating them about the impacts of wildlife trafficking, on people as well as wildlife, and encouraging them to examine their purchasing patterns in a context broader than personal desire or cultural tradition. At the same time, we recognize that markets for illegally traded wildlife exist for different reasons around the world and that approaches that work well in the United States may find less success elsewhere. To accomplish this goal, the United States Government will:

- **Raise Public Awareness and Change Behavior—**We will work to raise public awareness and recognition of wildlife trafficking and its negative impacts on species, the environment, security, food supplies, the economy, and human health. We will work with public and private partners to communicate the details and hard truths about these activities. By reproposing the retailing of the Save Vanishing Species Semi-Postal Stamp, we can provide the public an avenue to participate in financing antitrafficking efforts. It is not enough to increase public awareness; we will also target consumption patterns and look for opportunities to promote public engagement more directly. Applying the lessons learned from past campaigns, we will craft our messages and structure our efforts with the assistance of those with expertise and experience in developing, implementing, evaluating, and refining effective public communication strategies and educational tools.
- **Build Partnerships to Reduce Domestic Demand—**We will work with partners across the United States, including nongovernmental organizations and diaspora communities, to reduce domestic demand for illegally traded wildlife and wildlife products. We must team more effectively with the transportation industry, the tourism sector, restaurant and hotel associations, those in the exotic pet industry, companies operating internet marketplaces, and other private sector entities in this effort. We will strengthen our partnerships with nongovernmental organizations, civil society groups, private donors, the media, and academia that focus on research and building political will to stop wildlife trafficking and combat the organized criminal networks that conduct or facilitate it.
- **Promote Demand Reduction Efforts Globally—**We will encourage, support, and collaborate with all other interested governments to launch public information campaigns to discourage the sale and purchase of illegally traded wildlife. We will implement a public diplomacy strategy that uses local voices and partners with communities and international nongovernmental organizations to reduce the demand for illegally traded wildlife products in key markets. We will respect cultural and national sensitivities even as we ask communities to reconsider longstanding traditions that might incentivize or contribute to wildlife trafficking.

# III. Build International Cooperation, Commitment, and Public-Private Partnerships

Combating wildlife trafficking requires the engagement of governments in source, transit, and consumer countries throughout the world. We look to promote commitments to conservation and wildlife crime-fighting not only within countries that face this challenge but to facilitate cooperation across borders, among regions, and globally. We recognize that our efforts to engage the world in addressing wildlife trafficking must reach beyond governments and must recruit, embrace, and empower partners old and new—partners that range from nonprofit conservation groups to grass-roots activists, and from industries related to both legal and illegal wildlife trade to the media who report on them. And effective change requires political support, commitment and participation at all levels. To accomplish this goal, the United States Government will:

- **Use Diplomacy to Catalyze Political Will**—We will actively build on our successful efforts in the G-8, Asia-Pacific Economic Cooperation (APEC), and the U.N. Crime Commission to secure commitments from governments to take action and to treat wildlife trafficking as a serious crime. We will seek to work through other international fora, including the G-20, the Organization of American States, and the Organization for Economic Cooperation and Development, and the African Union, its subsidiaries, and African subregional bodies, to focus on wildlife trafficking and further strengthen international cooperation. We will continue to build support through regional and bilateral efforts, such as the bilateral dialogue on wildlife trafficking we launched as part of the United States-China Strategic and Economic Dialogue in July 2013.

- **Strengthen International Arrangements that Protect Wildlife**—We will expand our role to strengthen and ensure effective implementation of international agreements and other arrangements, particularly CITES, the principal international agreement that specifically addresses unsustainable and illegal wildlife, timber, and plant trade. We will work with the CITES Secretariat and other parties to adopt appropriate measures in response to accelerated or new threats and to improve global implementation of, and compliance with, the Treaty's requirements. We will support regional fishery management organizations to better detect and suppress Illegal, Unreported, and Unregulated (IUU) fishing and work with other international organizations to improve compliance and enforcement to protect wildlife and the habitats upon which wildlife depends.

- **Use Existing and Future Trade Agreements and Initiatives to Protect Wildlife**—We will engage trading partner countries on a regional and bilateral basis under existing and future U.S. free trade agreements, environmental cooperation mechanisms, and other trade-related initiatives to take measures to combat wildlife trafficking and to integrate wildlife trafficking and resource protection as priority areas for information exchange, cooperation, and capacity building.

- **Incorporate Provisions to Protect Wildlife in Other International Agreements**—We will seek opportunities to ensure wildlife trafficking is appropriately covered under relevant international agreements. We will seek provisions that ensure wildlife trafficking and related offenses are

extraditable offenses under extradition treaties where appropriate. We will also seek to ensure wildlife trafficking and related offenses are covered in mutual legal assistance treaties, including with respect to assistance in freezing and seizing the illicit proceeds of wildlife trafficking, where appropriate.

- **Cooperate with Other Governments**—We will cooperate with and assist wildlife range countries to strengthen their capacity to tackle poachers and wildlife traffickers by providing technical assistance, training, and support, as well as by facilitating information sharing. We will help to secure key wildlife populations and habitats; provide information on the status of targeted species and of groups involved in poaching and trafficking; help to enhance governance for the conservation and sustainable use of wildlife and other natural resources; and leverage wildlife trafficking with efforts in other areas, such as conservation of forest habitat, to develop synergies. We will engage key transit countries and encourage them to control goods passing through their territory. We will also seek to work with like-minded consumer countries in these efforts as well, as in efforts to reduce demand.
- **Promote Effective Partnerships**—We will promote joint efforts by governments, intergovernmental organizations, the private sector, nongovernmental organizations, media, academia, and individuals to address wildlife trafficking. We will work on the ground with and through local communities and conservation groups to develop and sustain antipoaching efforts, stimulate alternative livelihoods, and create support for community-based economically-viable wildlife conservation and antipoaching efforts. We will continue to support and coordinate with international groups and coalitions that target wildlife trafficking and will invite other governments and organizations to join us to take collective action, leverage resources, maximize impact, and minimize duplication of efforts. We will build partnerships with the private sector to share and implement best practices that will support sustainable supply chains and avoid contribution to illegal wildlife trade. We will also work with partners in industries, including those that deal with live wildlife or use legally traded wildlife, to promote mechanisms that reduce the risk of illegal products entering the supply chain and assure consumers that the products they purchase were obtained legally and sustainably.
- **Encourage Development of Innovative Approaches**—We will leverage the United States technological expertise and our convening power to promote creative ideas, innovative solutions, and strategic partnerships to address forensic, financial, and other key issues to increase our sophistication ahead of the criminals involved in this illegal trade chain. We will challenge the private sector, the nongovernmental organizations and academic communities, and partner countries to think beyond business as usual.



# Conclusion

This *Strategy* recognizes that we must redouble our efforts to address wildlife trafficking now if we are to preserve species and promote global peace and economic stability.  The actions needed to disrupt and deter wildlife trafficking are clear, as are the consequences of failing to act both quickly and strategically in response to this multidimensional threat.  The United States must curtail its own role in the illegal trade in wildlife and must lead in addressing this issue on the global stage.  By working across Federal departments and agencies, the Presidential Task Force on Wildlife Trafficking, in consultation with the Advisory Council, will implement this strategy and collaborate where appropriate with the nongovernmental organizations and the private sector to ensure success.  We can strengthen and expand enforcement and demand reduction efforts and promote and secure global commitment and cooperation in combating wildlife trafficking.  In all of our endeavors, we must foster and strengthen partnerships with other governments, the nonprofit conservation community, and the private sector.  No one country can tackle these issues on its own.  This is a global challenge that requires global solutions. It is only by working together that we can develop effective solutions to combat wildlife trafficking and protect our natural resources for future generations.



# National Strategy for Combating Wildlife Trafficking

# ATTACHMENT 2




# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/AIA/DMA

Memorandum

To: The File

From: Chief, Branch of Permits

Date: 7/22/14

Subject: Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014

[This document, originally signed on July 17, 2014, has been revised to make a technical revision to address an editorial error (pages 8 and 11 of the original finding) and to reflect ETIS data from the 16th Meeting of the Conference of Parties to CITES (page 8 of the original finding). These technical revisions did not alter the analysis or decision announced in the July 17 finding.]

This document supersedes the April 4, 2014, "Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014", and the April 17, 2014, revision to that previous document.

The African Elephant (Loxodonta africana) is listed as threatened under the U.S. Endangered Species Act with a special rule [50 CFR 17.40(e)]. The special rule gives the requirements for the import of sport-hunted trophies. Under paragraph 17.40(e)(3)(iii)(C), in order for the U.S. Fish and Wildlife Service (Service) to authorize the import of a sport-hunted elephant trophy, the Service must make a finding that the killing of the animal whose trophy is intended for import would enhance the survival of the species in the wild. In evaluating the available data on elephant hunting in Zimbabwe, the Service has determined that it is unable to make a finding that the killing of elephants in Zimbabwe, after April 4, 2014, whose trophies are intended for importation into the United States, would enhance the survival of the African elephant in the wild. Therefore, the trophies, part or products, of elephants taken in Zimbabwe after April 4, 2014, will not be allowed to be imported into the United States. This finding will be re-evaluated in December 2014 to determine if new information indicates that the killing of animals whose trophies are intended for import would enhance the survival of the species in the wild, including whether sufficient changes have been made in Zimbabwe to allow imports of trophies taken in 2015.

General considerations:

In evaluating whether sport-hunting is contributing to the enhancement of African elephants within a country, the Service looks at a number of factors. The Service evaluates whether a country has a valid national or regional management plan and if the country has the resources and political will to enact the plan. If there is a plan, what government entities implement the plan and how often is it reviewed and updated? Does the plan have clear, achievable objectives? Are the objectives measurable and are they being achieved? Is there an adaptive management approach within the plan so that enacting agencies can quickly respond to changing environmental or social issues?

The Service also evaluates the status of the elephant population and trends over time. Particularly, we are interested in population numbers, sex and age-class distribution, and mortality rates (both natural and man-induced). Are standardized surveys being conducted and, if so, what are the timing, census methodology, and coverage? Since elephant populations can move across international borders, what level of cooperation is there between neighboring countries in management and surveying efforts for shared populations? How is poaching accounted for within survey efforts?

As with any wildlife species, the policies on how the central and regional governments address management efforts, human-elephant conflicts, poaching, and sport-hunting greatly affect the long-term survival of elephant populations. While recognizing that there may be limited resources available for elephant management, the Service considers what national policies are in place to address human-elephant conflicts and problem elephant control. Is there a policy on culling surplus animals and removal of nuisance animals? Is there domestic harvesting of. elephants for local consumption or use? The amount of protected area either set aside for elephants or managed for elephant populations and the level of protection provided is also important in the Service's ability to determine whether imports of trophies could be authorized.

Finally, the Service considers how the sport-hunting program has been incorporated into national/regional management strategies, particularly in light of data on population numbers and trends, levels of utilization (both legal and illegal), and ability to effectiveness of implementing hunting programs, and that the program, and therefore trophies taken in the program, meet the requirements for the import of sport-hunted trophies under paragraph 17.40(e)(3)(iii)(C). Are sufficient funds to address management needs generated through the hunting program? Are the funds dedicated to management efforts or do they go to a general treasury fund? How are hunting quotas distributed? If there are concession areas, how are they managed and allocated?

Basis for Finding for Zimbabwe:

In the April 4, 2014, finding, and the revised finding of April 17, 2014, the Service stated that it was unable to make the positive finding to allow imports primarily due to the limited information available to the Service. At that time, the Service had not received any information in writing from the Zimbabwean Government since a U.S.-inquiry in 2007. At that time, the Service

received a response consisting of three undated and unsigned papers, which seemed to rely on somewhat dated information, and a 1997 elephant management plan. Between that time and April 2014, we had received no additional written information from the Zimbabwean government, but we have received various anecdotal reports and information provided in CITES documents presented at various CITES meetings. Service representatives have met in person with Zimbabwe representatives at various times in the past 6 years, usually in the context of annual meetings of hunting organizations in the United States. Little new or additional information has been provided during those meetings. Therefore, on April 4, 2014, a letter (herein referred to as the Service inquiry) was sent to the Zimbabwe Parks & Wildlife Management Authority (ZPWMA) with a series of questions that would assist the Service in making a final determination on trophy imports. On April 14, 2014, The Director-General of ZPWMA sent a letter to the Service expressing concerns over our decision to establish a temporary suspension. On April 17, 2014, the Director-General sent a response (herein referred to as ZPWMA response) to the Service inquiry. Several weeks later, the Service received a number of additional documents, including copies of Zimbabwean laws, and other supporting documentation that was referenced in the ZPWMA response. In addition, on June 6, 2014, the Service received additional relevant information from Conservation Force, a U.S.-based conservation and hunting NGO. The Service has also received a number of comments from individuals and associations connected to the hunting industry in Zimbabwe or southern Africa. This updated finding is the result of an analysis of this more recent information from Zimbabwe and other sources.

***Management Plans***: In the Service inquiry, the Service asked whether Zimbabwe had a current national management plan for elephants. In the ZPWMA response, Zimbabwe responded that the management plan consisted primarily of The Policy and Plan for Elephant Management in Zimbabwe (1997) and Elephant Management in Zimbabwe, third edition (July 1996). In addition, ZPWMA stated that they also implement other plans: "The African Elephant Action Plan"(CoP15 Inf. 68), SADC Protocol on Wildlife, and Elephant and Rhino Security Plan. In the ZPWMA response, ZPWMA stated that all the protected areas with Zimbabwe have "specific aspects of elephant monitoring programs that are implemented and reviewed on an annual basis." ZPWMA stated that information on the status of the elephant is derived from aerial surveys, water hole counts, walking transects, visitor observation, and ranger-based monitoring. In addition, through the CITES Monitoring of the Illegal Killing of Elephants (MIKE) program in two areas, ZPWMA stated that they are regularly monitoring the status of the elephant population, including poaching.

According to their response, ZPWMA is the sole legal authority, under the terms of the Parks and Wildlife Act, Chapter 20:14, for administering the management plans and overall management of elephants in Zimbabwe. Through an adaptive management approach, ZPWMA stated that aspects of the elephant management plan are "reviewed through annual stakeholder consultative national workshops" with government, NGO, local community, safari operator, and private sector participation.

In Zimbabwe, the elephants range is classified into and apparently managed in four major sub-regions: the Matebeleland north-west, Mid Zambezi Valley, Sebungwe, and South-East Lowveld.

As stated in Elephant Management in Zimbabwe, third edition, there have long been concerns that high elephant concentrations have had a great impact on Savanna ecosystems within Zimbabwe. In 1975, Zimbabwe passed the Parks and Wild Life Act that established National Parks to preserve and protect wildlife and plants and to maintain ecological stability. Until 1989, Department of National Parks, Wildlife, and Land Management (DNPWLM) managed elephant densities in protected areas through culling operations. This practice was drastically reduced due to lack of funds and possibly due to negative public opinion. In 1992-1993, Zimbabwe experienced a major elephant die-off in the Lowveld region due to severe drought conditions. A major culling operation was resumed in this area, where 350 elephants were culled. In addition, DNPWLM conducted a translocation operation where 1,400 elephants were translocated to private conservancies, and about 200 were translocated to South Africa to stock a new Game Park. Despite these efforts to reduce the Lowveld population, 1,500 elephants died due to natural mortality. In 2001, DNPWM was replaced by ZPWMA through an amendment to the Parks and Wild Life Act, Chapter 20:14.

Elephant Management in Zimbabwe provides a historical review of elephant status in Zimbabwe prior to 1996 that establishes a good baseline for ZPWMA. The document also identified three major outcomes: maintain at least four demographically and genetically viable populations; maintain numbers and densities below levels which will not compromise biodiversity; and maintain or increase elephant range at or above 1996 levels. The document, however, primarily focuses on the use of culling as the major approach to management of elephants. While the Service recognizes the value of culling as part of a management program, the current relevance of Elephant Management in Zimbabwe mostly appears to be irrelevant since its focus is primarily culling and Zimbabwe is currently unable or unwilling to implement culling operations. Further, the document does not establish specific measurables or management actions that need to be taken. Instead, it is more of a philosophical discussion on the merits of culling and efforts that must be taken to ensure that culls meet the desired management results. The document did make one relevant statement (although I am sure that there are other salient points made in the document) According to the document, in managing elephant males for sport hunting, it is essential to account for all adult males removed from a population, including animals taken through problem animal control and poaching. The document goes on to state that the "sport hunting quota should be reduced, to zero if necessary, if more than 0.75% of the populations is being killed in other ways."

The Policy and Plan for Elephant Management in Zimbabwe was the outcome of a "Zimbabwe Elephant Management Framework" workshop held on January 13, 1997, in Harare. The document does an excellent job of summarizing the issues that were affecting elephant populations in Zimbabwe at the time, as well as establishing strong policy statements on elephant management. However, while the document makes a clear goal statement and establishes ten objectives with management actions identified, it does not sufficiently expand on any methodology to meet the objectives or complete management actions. Without a plan to take specific actions to meet the objectives, or at least a clear framework on how adaptive management efforts would be monitored to ensure that they are meeting the stated objectives, it is not clear to the Service how this document could serve as a "management plan." Given the general level of stated objectives, it does not appear that the objectives or even the management actions of this 1997 document need

updating to be beneficial, as much as the document needs to be expanded to identify specific measurable outcomes. Further, while the material received from Conservation Force and the ZPWMA as a result of the Service inquiry provided snippets of information that indicate that some aspects of this document are being met, the Service did not receive any meaningful information or consolidated documentation that indicates, since the inception of this document in 1997, which objectives were being met or how.

Other documents provided by ZPWMA because of our inquiry "The African Elephant Action Plan"(CoP15 Inf. 68), SADC Protocol on Wildlife, and Elephant and Rhino Security Plan also establish broad policy goals and objectives, but provide very little specific management actions or measurables. The Zimbabwe Policy for Wild Life is a general framework, published in November 2000, on how ZPWMA would be managed to ensure that Zimbabwe's wildlife and their habitats are appropriately managed. This document specifically acknowledges that "[I]t is intended that [this] policy will be followed by detailed management plans and enabling legislation for those issues which merit them." It is not clear if detailed management plans for elephants have not been developed because ZPWMA does not believe that elephants merit such plans or if detailed plans have been developed, but were not provided to the Service.

Finally, the National Environmental Policy and Strategies, published in June 2009, is a general policy framework for all environmental issues in Zimbabwe. The document, while addressing ways to maintain environmental integrity, social issues, economic issues, and environmental management, establishes "guiding principles" and "strategic directions" for addressing biodiversity (Guiding Principle #9 and 10), flora (#11 and 12), fauna (#13), genetic resources (#14), protected areas(#15), natural resource management (#43), and wildlife and fisheries (#45). However, these guiding principles and corresponding strategic directions are only broad guidance and do not identity any specific management activities.

Without management plans with specific goals and actions that are measurable, the Service cannot determine if ZPWMA is implementing the well-articulated, but general, goals and objectives that appear in Elephant Management in Zimbabwe, The Policy and Plan for Elephant Management in Zimbabwe, and other Zimbabwean policy documents. Overall, ZPWMA did not provide, and the Service otherwise does not have, any information indicating that Zimbabwe is implementing appropriate management of the national elephant populations.

***Population Status***: In order to manage any population to ensure an appropriate population level and determine whether sport hunting is having a positive effect, it is vital to have sufficient data on population numbers and/or population trends to base management decisions. This is particularly the case with elephants and establishing hunting quotas. As stated in Elephant Management in Zimbabwe, sport hunting quotas should be reduced or eliminated if the overall offtake of male elephants, from all sources, is greater than 0.75% of the total population. Without current population data, it is therefore not possible to accurately determine what impact hunting, in conjunction with other offtakes, like problem animal control or poaching is having on Zimbabwe's elephant population.

According to the IUCN SSC African Elephant Database report "2013Africa," the elephant population in Zimbabwe in 2007 was 99,107, of which 85% (84,416) was classified as "definite" and only 0.3% (291) was classified as "speculative". While the total population in 2012 was estimated at 100,291, only 47% (47,366) was classified as "definite" and 45% (45,375) were classified as "speculative". Only 304 "definite" animals were counted by aerial or ground counts, while the remaining 41,840 "definite"' animals were counted through sample counts or dung counts, a less accurate methodology than properly conducted aerial surveys, and the remainder were what the IUCN report called "other guesses". According to this report, half of the population estimates included in 2012 is older than 10 years, resulting in a degradation of the quality of data. Very few new surveys have been conducted since 2007 and of those conducted, only cover a small percentage of the overall population. Further, according to the report, only 8 of estimates used in "2013 Africa" report were the result of repeated surveys. As noted in that report, "this lack of systematic and updated monitoring data is of serious concern for possibly the third largest elephant population in Africa." While the Zimbabwe Government continues to state that elephant population estimates exceeding 100,000 elephants, this number is clearly based on outdated information.

The summary in the IUCN report indicates that, of recent surveys, only about 1% of the country has been covered by more reliable aerial or ground surveys for population estimates, while about 50% was covered by sample counts or dung counts, a less robust methodology. For a substantial portion of the country, there have been no recent surveys and most estimates are based on 2001 figures. Even areas within Zimbabwe that had expressed higher levels of poaching or human-elephant conflicts, such as Hwange National Park, do not appear to have been surveyed since 2001. Several areas that were covered in the current surveys (2006 – 2010) indicate that there has been a substantial decline in the population, whether related to habitat degradation or poaching is unknown.

Recently, according to information provided by ZPWMA, two surveys were conducted in Save Valley Conservancy and in Gonarezhou National Park (and surrounding areas). In Aerial Survey of the Larger Herbivores, Save Valley Conservancy, Zimbabwe, a report compiled in September 2013 by the Technical Advisory Committee of the Save Valley Conservancy, 1,538 elephants were counted. Based on nine years of aerial surveys (2004-2010 and 2012-2013), not all of which covered all of the Save Valley Conservancy, there does appear to be a short-term increase in elephant population density of 9.5%. However, trend analysis of the last three aerial surveys indicated a 2.2% population increase in elephants. Further, the 2012-2013 surveys were only partial surveys and conditions were such that some double counting may have occurred.

In October 2013, aerial surveys were conducted in Gonarezhou National Park, Malapati Safari Area, and adjacent communal lands. From these surveys, it was estimated that there were 10,151 elephants in the Gonarezhou National Park area, the highest estimate since sample surveys began there in 1975. The estimated total number of elephant carcasses in the entire survey was 513. The "1+2" carcass ratio (fresh carcasses (category 1) and recent carcasses (category 2), however, was 0.39% in the entire survey area. The Service recognizes that the increase in elephant population in Gonarezhou National Park is excellent news. However, a carcass ratio of less than 4%, the expected level due to natural mortality alone, is considered unrealistically low. This

unrealistically low number could be an indication that there were problems with the survey.

Figures presented at the 16th Meeting of the Conference of the Parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora in Bangkok, Thailand, March 3-14, 2013 (CoP16 Doc. 53.1) indicates that, from 2002 – 2010, the percentage of illegally killed elephants (PIKE) in Zimbabwe was circa 24%, whereas in 2011 that number jumped to 67%. While the numbers for 2012 and 2013 are not yet available, the trend would indicate a higher percentage of illegal killings and a population in decline.

Although the IUCN "2013 Africa" report speculates that Zimbabwe has the third-largest elephant population in Africa, without current population estimates and a better understanding of the offtake from other sources, like poaching and problem animal control, it is not possible to determine if the total offtake exceeds the recommendation in the Elephant Management in Zimbabwe of 0.75% of the males and whether the hunting quota should be adjusted. With the upcoming Pan African Elephant Aerial Survey, which would cover most of the elephant range within Zimbabwe, a more definitive population estimate can be made, and a more robust carcass ratio could be determined. In conjunction with the 2012 and 2013 PIKE data, a better understanding of the population dynamics within Zimbabwe can be developed. However to provide accurate estimates, the Pan African Elephant Aerial Survey would have to be conducted using the standardized survey protocols and incorporate modern technological improvements, including the use of the latest technological advancement with voice data recordings and geo-referenced digital photographs of all elephant and carcass sightings.

***Regulations and Enforcement:*** Under the Parks and Wild Life Act, Zimbabwe has established the regulatory mechanism for the ZPWMA and its programs. This law includes sections on virtually every aspect of ZPWMA, including requirements for annual financial audits and reporting to the central government. The law also provides for substantial penalties for the unlawful possession of or trading in ivory. The first offense carries a minimum of 5 years and a maximum of 15 years in prison. The second offense carries a minimum prison term of 7 years and a maximum of 15 years. However, according to the response from ZPWMA to our April 4 inquiry, the General Laws Amendment Act (No. 5) of 2010 provides for a mandatory imprisonment of not less than nine years for poaching. If properly enforced, it appears these penalties would be a sufficient deterrent of poaching.

However, based on the information the Service currently has, we do not have a good understanding of the ZPWMA' annual operational budget, how much money is generated by elephant hunting, or how these funds (or the lack of these funds) impact the ability of ZPWMA to adequately enforce the Parks and Wild Life Act, day-to-day management, or anti-poaching efforts and therefore, provide the required enhancement to the species in order for the Service to allow imports under the Elephant special rule. In January 1996, the Government of Zimbabwe approved the establishment of the Parks and Wild Life Conservation Fund, a statutory "Fund" that provides for financing operations directly from wildlife revenues. However, only revenues generated through sport-hunting conducted on state and private lands are used to finance ZPWMA and to our knowledge, no other government funding is provided and only limited outside funding from NGOs or other Governments appears to be available. The 2002 CITES Panel of Experts raised

concerns as to the status of ZPWMA relating to its weak financial base, lack of management skills, inadequate and old equipment, and poor infrastructure. No new information was provided by ZPWMA or other sources as a result of the Service's April 4 inquiry. We have no current information as to the funding level of ZPWMA or any indication that the financial base, management skills, equipment, or infrastructure have improved.

That being stated, the Service did recently receive a document written by Rowan B. Martin entitled "Ban on Import of Elephant Trophies into the USA from Tanzania and Zimbabwe: Part 1: Costs of Protection of Elephant Areas." The undated document discusses the budget requirements for protecting wildlife areas in Zimbabwe based on calculations developed by Mr. Martin in 1996 and 2004. The document states that for Zimbabwe, given the total elephant range within the areas controlled by ZPWMA, the annual budget required to protect the elephant range would be US$21 million. In 2013, ZPWMA requested $28 million from the Treasury, the major part of which was intended for anti-poaching efforts. They were allocated only $1.5 million. According to Martin, this amount, along with the revenue from trophy hunting licenses, is not sufficient to provide the needed level of protection for land under ZPWMA' authority.

At the 15th Meeting of the Conference of the Parties to CITES, a report on the Elephant Trade Information System (ETIS) was presented (CoP15 Doc. 44.1 Annex). In the report, Zimbabwe was specifically identified with regards to management issues and illicit ivory trade. The report noted the existence of organized criminal activities within Zimbabwe, including reports of the involvement of politicians, military personnel, and Chinese nationals in illicit wildlife trade. The report goes on to state that the law enforcement effort ratio within the countries grouped for the analysis had dropped to 40%, a decline of 4% from the CoP14 analysis. This declined indicates a less than average performance and was attributed to the situation in Zimbabwe.

At the 16th Meeting of the Conference of the Parties to CITES, the report on ETIS (CoP16 Doc. 53.2.2)expressed concerns about Zimbabwe in regards to illegal trade in ivory. The report stated that, as a group, Zimbabwe, Botswana, and Namibia, were in the middle range, when compared to 64 other consumer or producer countries of elephant ivory, in terms of the mean number of seizures identified, but ranked fifth in the measure of scale, indicating most of the seizures were in the 10-100 kg class (i.e., an average number of seizures that were predominately smaller in size). The report noted that 65% of the ivory trade between 2006 and 2011 had occurred since 2009, indicating that illegal ivory trade is increasing. Governance indicators were mixed, with a much lower than average World Bank "rule of law" score, but the second highest law enforcement ratio of any group of countries evaluated. The report, however, supports the Services previous concerns regarding Zimbabwe's inability in its governance by specifically identified Zimbabwe as pulling these scores down in both cases, "especially in the "rule of law" score, indicating that far greater challenges exist in that country". The report also noted that Zimbabwe was the source of nearly two tons of worked ivory seized in Cape Town, South Africa in 2009.

In several letters sent to the Service by Zimbabwean safari outfitters and hunting guide organization, it was stated many times that the presence of hunters, specifically U.S. hunters since they appear to make up the vast majority of sport hunters in Zimbabwe, and subsequently the professional hunters and safari outfitters guiding the hunters, is the major deterrent to poaching in

Zimbabwe. Several specific incidents were reported where it was the safari outfitters and hunters, and not the ZPWMA rangers, who thwarted poachers. At least in one incident, the 2013 Hwange National Park poisoning, it was reported that the safari outfitter paid for all of the anti-poaching efforts, including paying for all transportation for the ZPWMA rangers and feeding them. It would be expected that the presence of anyone in the field, particularly armed individuals like hunters, could deter poachers from carrying out illegal activities where the likelihood of being captured is heightened. However, no evidence was presented to the Service that supports the belief that without hunters, specifically U.S. elephant hunters, that poaching in Zimbabwe would become rampant. It is not likely that legal hunting for elephants or other wildlife is not so widespread enough or at a high enough density level to significantly reduce poaching levels in and of itself. This is particularly true for national parks, since legal hunting is not allowed.

The various statements about trophy hunters and outfitters being a major deterrent to poaching does raises the Service concerns about the effectiveness of funds utilization by ZPWMA. Specifically, there are concerns that ZPWMA either is not generating sufficient funds to support adequately their stated mission or is not utilizing the available funding in a manner that supports their stated mission. Without additional information on ZPWMA's funding basis and operating expenses, the Service cannot determine that Zimbabwe has adequate mechanisms to enforce the laws and regulations currently on the books.

***Sustainable Use***: For the 2014 hunting season (January – December 2014), Zimbabwe again has established an export quota of 500 elephants (1000 tusks). This is the same quota that Zimbabwe has reported to the CITES Secretariat since 2004. According to available information, it does not appear that Zimbabwe actually fills this quota each year, but due to variation in how trophies are categorized in CITES trade data, it is difficult to categorically identify the actual numbers of hunted elephants that are exported each year from these data. Information provided by ZPWMA as a result of our April 4 inquiry did not identify the number of trophies exported annually. There were several statements from safari outfitters that referenced a number of approximately 160 elephants taken annually, but this number is not supported by any documentation.

There are six categories of offtake monitored by ZPWMA which include: Cropping (population control, possibly meat supply to rural communities and live animals to breeders), Natural Mortality (found dead of natural causes), Accidents (killed by trains, landmines, or vehicles), Poaching (illegal take), Problem Animals (elephants destroyed to protect human life and property), and Management Offtake (offtake due to other management decisions). Cropping presumably includes sport hunting, though that is not specifically stated in any documents provided. No information was given on the number of elephants that are taken in each of these categories. It does not appear that Zimbabwe is currently conducting any culling operations, besides trophy hunting if considered a "cull". However, culling to remove excess animals is apparently a corner stone of Zimbabwe elephant management practices.

According to information from ZPWMA, 293 elephants were poached in 2013, including the 105 elephants poisoned in Hwange National Park[1]. Of the five years of data ZPWMA provided in

---

1 In our April 4, 2014, finding, we incorrectly stated that over 300 elephants had been poisoned.

their response, an average of 190 elephants were identified as being poached annually. In 2009 and 2010, there was an average of 111 elephants poached; however, between 2011 and 2013, the average more than doubled to 243 elephants. It is not clear what stimulated this significant increase. Certainly there appears to have been an increase in demand, since many countries appear to have also experienced a marked increase. It is also possible that shifts in land tenure, governance, ZPWMA' limited financial resources, or economic factors contributed to the increase. Further, while the number of animals poached in Zimbabwe does not appear to be as high as in other countries, information that was presented at the 16th Meeting of the Conference of the Parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora in Bangkok, Thailand, March 3-14, 2013 (CoP16 Doc. 53.1) indicates that there has been a steep rise in poaching incidents. Without more accurate population data, like what is anticipated through the Pan African Aerial Elephant Survey, there is no way to determine whether these numbers, combined with other offtake, are sustainable without valid population estimates.

While the number of elephants that are taken as problem animals was not elucidated in material provided by ZPWMA, it is clear from their response and documentation provided by Conservation Force, a large number of elephants are taken each year. ZPWMA reported that in a three-year period (2009-2011), there were 372 human-elephant cases for four "hot spot" districts. It is not clear if elephants were removed in each of these cases. However, there is anecdotal evidence within the information available to the Service that the number of problem animals may equal or exceed the number of elephants taken through sport hunting.

African elephants in Zimbabwe are listed in CITES Appendix II, with an annotation that allows trade in hides. According to CITES trade data, at least 2373 hides were exported in 2010, 3204 in 2011, and 4675 in 2012. It should be noted that these numbers probably do not equate to whole animals, but are the number of parts of hides. Some of these hides may have been obtained from sport hunted trophies, problem animal control, or culling operations. Therefore, it would be impossible to speculate on the number of elephants taken besides the ones taken as trophies or problem animal control. It is clear, however, that some level of offtake in the form of commercial exports of hides is occurring.

According to information from ZPWMA, as well as information provided by many of the comments received by the Service from safari outfitters and professional hunters associations, the principle form of utilization of the elephant in Zimbabwe is sport-hunting. Quotas are apparently set to maximize the sustainable production of high-quality trophies without detriment to the population. However, it appear that the national export quota of 500 elephants is the goal to reach when establishing quotas for each hunting area, as oppose to determining the best quota to facilitate management goals for those areas. According to the material provided to the Service, it appears that the complete quota for 500 elephants is allocated to each area based on recommendations from ZPWMA ecologists, field staff, safari operators, other stakeholders, and technical specialists through "multiple stakeholders participatory quota setting." Apparently, on an annual basis, stakeholders use available population data to propose a particular quota for an area to a Quota Setting Workshop. At this workshop, it is determined if the proposed quota should be adopted or modified in relation to other proposed quotas. Factors that are apparently

considered each year include population estimates, growth rates of populations, size of hunting areas, status of habitat, and target elephant population size.

While the material provided to the Service lays out the general process, the Service did not receive any specific information on how quotas are established. ZPWMA provided the District Quota Setting Toolbox and the Quota Setting Manual, published in 2000 and 1997, respectively. While excellent resource and training material, these documents only provide a general overview of quota setting for all species in Zimbabwe. In establishing a quota, one must take into consideration not only the habitat, population size, and size of the hunting area. One must also take into consideration other offtakes that may be affecting the species you are addressing and other environmental aspects that could influence the species. Nothing that ZPWMA provided addresses these more specific elements. Further, if ZPWMA starts with the premise that the sum of all established quotas must equal the national export quota, it is not clear if the science is driving the quota setting process or the social/economic benefits derived from hunting is the driving force. Finally, without current population data and information on the distribution of elephants across the country, both of which would come from scientifically based population surveys, it would appear that establishing a scientifically viable quota, either higher or lower than previous years, would be impossible. The current quota-setting process utilized by ZPWMA may actually be a very effective system that takes into consideration all of the issues raised in this document, but without documentation of the system, the Service cannot determine if sport hunting quotas are reasonable or beneficial to elephant populations, and therefore whether sport hunting is enhancing the survival of the species.

***Revenue Utilization:*** On communal lands in Zimbabwe, the protection of elephants falls under the Communal Areas Management Programme for Indigenous Resources (CAMPFIRE), which encourages reductions in human-elephant conflicts through conservation-based community development. The program was established in 1989 as a means of providing an economic incentive and return to rural communities while encouraging tolerance for the elephant and sustainable use of natural resources. This program has been the model for community-based conservation efforts in several other African countries and identified as an innovative program in the past. Under this program, there are currently 29 Rural District Councils (RDCs) that have been granted Appropriate Authority status under the Parks and Wild Life Act. There are approximately 13 RDC's with exploitable wildlife resources that make up the core of the CAMPFIRE program. Revenue generated through sport hunting is spent according to decisions taken by RDCs and their constituent communities. ZPWMA provides guidelines for the distribution of these funds between administrative costs, cost of wildlife management, and returns to communities in wildlife areas.

The CAMPFIRE program has come under criticism relating to excessive retention of generated funds by district councils which has resulted in diminished benefits being realized by the communities it was designed to help. Information supplied by the CAMPFIRE Association to the CITES Panel of Experts in 2002 indicates that this situation may be improving. The information that was provided to the Service after its April 4 inquiry does not, however, support or refute this statement. Under a community-based conservation program, like CAMPFIRE, rural communities should benefit from revenue generated by sport-hunting. With increased

human-elephant conflicts on communal lands, sport-hunting may be an important tool which gives these communities a stake in sustainable management of the elephant as a natural and economic resource. However, without current information on how funds are utilized and the basis for hunting off-takes, the Service is unable to confirm this assumption.

***Local conservation efforts***: Much of the information provided by Conservation Force and other commenters addressed the economic impact of the suspension to local conservation efforts being carried out by individual landowners or lease-holders, safari outfitters, and conservancies. It is clear that outstanding conservation work is being carried out in some areas that is funded solely or in major portions by private individuals or companies. It is also clear that these individuals may be impacted by a suspension of elephant trophy imports. However, it is unknown whether and to what extent these individuals would reduce their conservation efforts based on the inability of U.S. hunters to import a sport-hunted trophy. In addition, the information available to the Service on the conservation works being carried out by non-governmental entities, at this time, appears to be limited to a small group of situations and is not the norm for Zimbabwe as a whole. While these pockets of conservation are greatly needed, there does not appear to be a mechanism in place, such as government support, tax incentives, or land tenure security, to promote or sustain these efforts across Zimbabwe's elephant range. Therefore, the Service cannot determine that these limited, but seemingly important, activities would are provide the enhancement required under the ESA to allow imports of trophies taken throughout Zimbabwe.

***Summary***: When the Service announced the interim suspension on the import of elephant trophies from Zimbabwe on April 4, we based the decision on the limited information available to the Service at that time. In response to an April 4 letter to the Government of Zimbabwe, we received a large amount of information directly from ZPWMA. In addition, we received information from Conservation Force and a number of safari outfitters and professional hunter associations. Some of the information did indicate that hunting in Zimbabwe was providing a benefit to elephants, while other information raised questions that were not answered. Based on all of this information, we determined we are unable to find that the killing of an elephant whose trophy is intended for import would enhance the survival of the species in the wild due to the following factors:

- Zimbabwe's current elephant management plan consists of two primary documents drafted in 1996 and 1997. Although the documents provide a well-developed list of goals and objectives, there is no information on whether these goals and objectives have been met or could ever be met. Without information on how the strategies are being implemented, the Service cannot determine that the plans provide sufficient basis for making the required enhancement finding.

- Until the Pan African Elephant Aerial Survey is conducted to confirm or deny current population estimates, it does not appear that Zimbabwe has adequate information on elephant populations to establish scientifically defensible hunting quotas, particularly in light of the limited information on other means of offtake, such as poaching and problem animal control.

- While Zimbabwe has laws and corresponding regulations in place to address elephant management, there appears to be an inability due to either limited funding or inadequate governance to implement and enforce these laws. Further, since the central Zimbabwean Government is not allocating funding to ZPWMA and the vast majority of funding must come from hunting revenues, it appears that ZPWMA does not have the financial resources needed to adequately address elephant conservation and management needs. Lastly, it is unknown to the Service what efforts Zimbabwe is taking to rectify this situation.

- According to information provided, Zimbabwe has established hunting quotas for all areas of the country. However, the Service did not receive specific information on how these quotas are established, whether other forms of offtake, such as poaching and problem animal control, were taken into account, or what level of input biological factors are taken into consideration (as oppose to economic and societal considerations).

- While CAMPFIRE has provided strong conservation benefits in the past by promoting greater tolerance of wildlife in rural communities, the program has more recently come under criticism relating to excessive retention of generated funds by district councils, resulting in diminished benefits to communities. The information provided the Service after its April 4 inquiry did not support or refute this statement. With increased human-elephant conflicts on Communal lands, sport-hunting may be an important tool which gives these communities a stake in sustainable management of the elephant as a natural and economic resource. However, without current information on how funds are utilized and the basis for hunting off-takes, the Service is unable to confirm whether revenue generated through sport hunting actually provides an incentive to local communities to conserve elephants.

- There are clearly "bright spots" of elephant conservation efforts, carried out by non-governmental entities, scattered around Zimbabwe that are providing a benefit to elephants. However, there are not enough of these "bright spots" to overcome the problems currently facing Zimbabwe elephant populations and to support a finding that sport hunting is enhancing the survival of the species. Without more support from the Central Government and Rural District Councils, these efforts are not likely to be fully successful or to compensate for the management deficiencies described above.

Therefore, with the exception of elephants that were harvested before April 4, 2014, the date of the announcement of the temporary suspension, no elephants harvested during 2014 may be imported into the United States.